FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 23, 2020

*Stephen, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 23, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| SHYANNE COLVIN, SHANELL DUNCAN, TERRY KILL, LEONDIS BERRY, and THEODORE ROOSEVELT RHONE,<br><br>               Petitioners,<br><br>v.<br><br>JAY INSLEE, Governor of the State of Washington, and STEPHEN SINCLAIR, Secretary of the Washington State Department of Corrections,<br><br>               Respondents. | NO. 98317-8<br><br>EN BANC<br><br>Filed ____July 23, 2020____ |

STEPHENS, C.J.—This matter came before us on a petition for a writ of mandamus from five inmates serving criminal sentences at different Washington Department of Corrections (Department) facilities. We retained jurisdiction because of the extraordinary nature of the relief petitioners seek—and because of the extraordinary danger COVID-19 (coronavirus disease) poses to inmates in Washington's prisons. But mandamus is not the answer for every emergency, and it cannot deliver the relief petitioners seek here.

Mandamus is a term familiar to attorneys and the judiciary, but not most members of the public. In plain English, petitioners ask the court to force Governor Jay Inslee and Department of Corrections Secretary Stephen Sinclair to reduce the prison population by ordering the immediate release of three categories of offenders. But the writ they seek asks us to encroach on the executive branch and exceed the court's authority; it would require the judiciary to supervise the executive based on policies the legislature never approved, in direct violation of long recognized separation of powers principles. Without a showing an official in the executive branch has failed to perform a *mandatory nondiscretionary* duty, courts have no authority under law to issue a writ of mandamus—no matter how dire the emergency. The petitioners alternatively seek leave to amend their petition by filing a personal restraint petition. But on the record before us, they have not shown that the respondents have acted with deliberate indifference to the extreme risk that COVID-19 creates for the incarcerated. Amending their mandamus petition would therefore be futile. For these reasons, we dismiss the mandamus action and deny the motion to amend.

## FACTS

The record here differs from a typical case in the Washington Supreme Court. We do not have the benefit of any hearings, factual findings, credibility

determinations, or discovery. Rather, the parties agreed on a record that mainly includes descriptions of the prison conditions, expert opinions on the risks that COVID-19 presents in the prison environment, and the petitioners' declarations as to their individual situations. For purposes of our decision, we accept the petitioners' factual descriptions as true. The petitioners claim close confinement creates a substantial risk of harm because of the current public health emergency caused by COVID-19. These concerns are legitimate and well founded. The current widely reported medical evidence suggests that the COVID-19 risks of serious complications or death are highest for offenders over age 50 and those with certain preexisting medical conditions, but it can also be serious for younger people and those in good health. And serious outbreaks have occurred at other prisons and jails nationwide.[1]

Concerns about COVID-19 are all the more serious because our understanding of this public health threat is evolving and incomplete. The virus's virulence and severity are unclear because there has been insufficient time to develop accurate, reliable, and widespread testing both for the virus and the presence of its

---

[1] Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus—96% Without Symptoms*, REUTERS (April 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state -prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSK CN2270RX [https://perma.cc/JGM4-CQF9].

antibodies. Without doubt, the prison system faces a daunting challenge from a serious public health threat.

Medical experts recommend limiting the spread of the virus by social distancing, frequent hand washing, and wearing masks or face coverings. Experts currently think the virus is unlikely to spread from person to person at a distance of more than six feet, and thus the primary mitigating measure has been social distancing. Based on this advice, beginning in March 2020, the governor has issued several proclamations through his emergency powers, all designed to limit the spread of the virus as much as reasonably possible.

Prisons are not designed to easily accommodate social distancing. To combat the virus in this setting, the respondents have developed and implemented a multistep plan. The Department issued social distancing guidelines to offenders in early March 2020, started screening visitors on March 6, and stopped visits on March 13, all in an effort to prevent the virus from spreading into facilities. But social distancing is difficult, if not impossible, in some prison settings due to logistics and population. The Department houses the named petitioners in various facilities throughout the state.

Each petitioner argues that we should grant their immediate release because they fall into one of three categories of risk: (1) those with preexisting medical

conditions complicated by COVID-19, (2) those over age 50, and (3) those who already have release dates pending within the next 18 months. Three petitioners fall within the first group. Shyanne Colvin was 7 months pregnant when the petition was filed, and she reported possible complications because she suffered a grand mal seizure and required preventive seizure medication. Leondis Berry is 46 years old and has serious heart conditions; he has had four heart surgeries and needs to use a pacemaker. He reports that he has housing available with his wife upon release. Theodore Rhone is 62 years old and has diabetes and high blood pressure. Rhone's declaration does not show what his housing situation would be if released.

In the second category, Terry Kill is 52 years old and reports that he has housing available with his wife. Shanell Duncan falls within the third category. He is 40 years old and has an anticipated release date of December 27, 2020. He reports that he has stable housing available with a partner in Spokane.

Neither the briefing nor the agreed record gives full information on the petitioners' criminal history nor any history of prison discipline. Colvin pleaded guilty to delivery of a controlled substance (methamphetamine) and a corresponding special allegation that she or an accomplice committed the offense in a county jail; she was thus subject to a mandatory 18-month sentence enhancement under RCW 9.94A.533(5)(a). *See State v. Colvin*, No. 36618-9-III, slip op. at 1 (Wash. Ct. App.

Nov. 14, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/366189_ unp.pdf. Records provided by amicus briefing show that Berry was convicted of multiple counts of first and second degree robbery. Rhone is serving a life sentence as a persistent offender and has a conviction for first degree robbery with a firearm. Victim impact statements included with amicus briefing describe Kill as having three felony convictions in Snohomish County, including a burglary of a vacation home. And records attached to the amicus briefing show that Duncan has convictions for third degree assault, unlawful possession of a firearm, robbery, and fourth degree assault involving domestic violence.

The petitioners claim crowded prison conditions do not allow for effective social distancing, creating an unreasonable risk of contracting COVID-19. At the time of filing, no member of the prison population in Washington had tested positive for the virus. A few days later, though, one prisoner at Monroe Correctional Complex (MCC) tested positive. In an apparent reaction to the news and fears of an outbreak, a significant disturbance ensued at MCC. The petitioners sought emergency relief, and we set an accelerated briefing schedule to consider their request. We also ordered the respondents to immediately exercise their authority to take all necessary steps to protect the health and safety of the prison population from COVID-19, and directed the respondents to file a report on their plans for

safeguarding prisoners from the disease. This order neither granted a writ of mandamus nor required any specific remedy. Instead, we intended the order to preserve and protect the petitioners' rights and claims to every extent possible pending oral argument.

As directed, the respondents filed reports detailing their safety plan and the steps taken. Besides the steps discussed above, the Department has tried to follow United States Center for Disease Control and Prevention guidelines by administering screening protocols, creating special procedures for transporting offenders, implementing physical distancing protocols, providing free soap and handwashing facilities, and issuing instructions for facility cleaning and sanitizing. These protocols included an order that all facilities ensure that all staff and offenders wear face coverings. The Office of Corrections Ombuds toured MCC and concluded that it was unable to effectively impose social distancing with its population, noting that both staff and incarcerated individuals asked that some offenders be released to increase the space available. Photographs from the tour show that although offenders and staff have surgical face masks, the common areas can become crowded. At oral argument, the respondents explained that greater space was available but the pictured offenders had chosen to congregate in the common areas and hallways. On April 15, 2020, the governor issued a proclamation suspending

various statutory hurdles to the early release of prisoners, commuting sentences for and ordering the release of certain nonviolent offenders. Proclamation by Governor Jay Inslee, No. 20-50 (Wash. Apr. 15, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-50%20-%20COVID-19%20Reducing%20Prison%20Population.pdf [https://perma.cc/C5J8-7KQ2]. The Department has since reported that most of those commuted offenders have been released.[2]

At oral argument, the respondents suggested that the prison population had been reduced from almost 18,000 to just over 16,000. They also informed the court that they planned to release Colvin into a home-release parenting program within one or two weeks.[3] They also reported that more than a dozen offenders at MCC had tested positive for the virus. One week after oral argument, the Department website clarified that 15 MCC inmates had tested positive and that one inmate on a separate work release program had also tested positive. Although no offenders at

---

[2] The petitioners argue that the respondents ultimately decided to release prisoners only because of this court's oversight. Although the release occurred after the lawsuit was filed, this court did not order the release of any offenders. And, contrary to the unjustified political attacks against our dissenting colleagues, no justice would have ordered state officials to immediately release serious violent offenders en masse.

[3] The Department did release Colvin following oral argument, but Colvin used methamphetamine in violation of the conditions of her release and has since been returned to prison. This unfortunate fact illustrates the difficulties inherent in determining which inmates should be released, even for the Department, which has expertise in this area. The dissent would have this court manage those decisions instead, but fails to explain how—or why—this court's inmate release decisions would be different from, better than, or more just than those reached by the governor and the secretary.

any other facilities had tested positive at that time, dozens of inmates and corrections officers have since been diagnosed with COVID-19 at the Coyote Ridge Corrections Center (CRCC). *See COVID-19 Data*, WASH. DEP'T OF CORR. (July 9, 2020) https://www.doc.wa.gov/corrections/covid-19/data.htm. The number of positive test results continues to increase: after oral argument, the Department reported that 58 offenders tested positive at MCC, 231 tested positive at CRCC, 2 tested positive at the Washington State Penitentiary, and 1 tested positive at the Washington Corrections Center. *Id.* The tragic deaths of Berisford Anthony Morse (a 65-year-old corrections officer at MCC), Victor Bueno (a 63-year-old inmate at CRCC), and William Bryant (a 72-year-old inmate at CRCC) underscore the serious danger COVID-19 poses in correctional facilities. Press Release, Wash. Dep't of Corr., First Washington Corrections Line of Duty Death from COVID-19 (May 18, 2020), https://www.doc.wa.gov/news/2020/05182020p.htm [https://perma.cc/EZ7T-WTV 4]; Press Release, Wash. Dep't of Corr., First Incarcerated Individual in Washington Dies of COVID-19 (June 18, 2020), https://doc.wa.gov/news/2020/06182020p.htm [https://perma.cc/UCJ5-55BU]; Press Release, Wash. Dep't of Corr., Second Incarcerated Individual in Washington Dies of COVID-19 (June 22, 2020), https://www.doc.wa.gov/news/2020/06242020p.htm [https://perma.cc/4BVC-9UK8].[4]

---

[4] On June 24, 2020, petitioners brought emergency motions to submit additional evidence regarding the significant rise in COVID-19 cases at CRCC and the conditions of

ANALYSIS

The question before us is not whether the risk of COVID-19 in Washington's prisons requires an immediate response to protect the lives of inmates and staff—clearly it does. Instead, this case asks whether this court can issue a writ of mandamus to direct that response by the governor and the secretary, or whether the petitioners have shown that their continued incarceration is unlawful. We answer no to both questions.

I. THE COURT LACKS AUTHORITY TO DIRECT OR OVERSEE THE GOVERNOR'S COVID-19 MITIGATION STRATEGY THROUGH MANDAMUS

A writ of mandamus is a rare and extraordinary remedy because it allows courts to command another branch of government to take a specific action, something the separation of powers typically forbids. *Walker v. Munro*, 124 Wn.2d 402, 407, 879 P.2d 920 (1994) ("When directing a writ to . . . a coordinate, equal branch of government, the judiciary should be especially careful not to infringe on the historical and constitutional rights of that branch."). "One of the fundamental principles of the American constitutional system is that the governmental powers are divided among three departments—the legislative, the executive, and the judicial—and that each is separate from the other." *Carrick v. Locke*, 125 Wn.2d 129, 134,

---

confinement in that facility. They also requested appointment of an expert to conduct supplemental fact finding. The court considered these motions on an expedited basis and denied them by order on July 10, 2020.

882 P.2d 173 (1994). Though "[o]ur constitution does not contain a formal separation of powers clause[,] . . . 'the very division of our government into different branches has been presumed throughout our state's history to give rise to a vital separation of powers doctrine.'" *Brown v. Owen*, 165 Wn.2d 706, 718, 206 P.3d 310 (2009) (quoting *Carrick*, 125 Wn.2d at 135, and citing WASH. CONST. art. II, § 1, art. III, § 2, art. IV, § 1).

The framers of the federal constitution designed this three-part system to prevent any one branch of government from gaining too much power. *See* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."); *Clinton v. City of New York*, 524 U.S. 417, 482, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (Breyer , J., dissenting) ("[T]he principal function of the separation of powers . . . is to . . . provid[e] a 'safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976))). This does not require that the branches of government be "hermetically sealed off from one another. The different branches must remain partially intertwined if for no other reason than to maintain an effective system of checks and balances." *Carrick*,

125 Wn.2d at 135.[5]  The separation of powers doctrine "serves mainly to ensure that the fundamental functions of each branch remain inviolate." *Id.*

The fundamental functions of each branch are familiar to most Washingtonians.  The legislative branch writes laws, WASH. CONST. art. II, § 1, the executive branch faithfully executes those laws, WASH. CONST. art. III, § 5, and "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803); *see also* WASH. CONST. art. IV, § 1 (vesting the judicial power of the state in this court, superior courts, justices of the peace, and inferior courts created by the legislature).

The writ of mandamus reflects this limited judicial role of saying what the law is.  When the law requires a government official to take a particular action, we have the power to issue a writ of mandamus to say so.  *See Freeman v. Gregoire*, 171 Wn.2d 316, 323, 256 P.3d 264 (2011) ("Mandamus is an extraordinary remedy appropriate only where a state official is under a mandatory ministerial duty to

---

[5] "Legislative control over appropriations, the executive power to veto, and the judicial authority to declare legislative and executive acts unconstitutional, are all examples of direct control by one branch over another." *In re Salary of Juvenile Dir.*, 87 Wn. 2d 232, 242-43, 552 P.2d 163 (1976) (citing U.S. CONST. art. I, §§ 8, 9; WASH. CONST. art. VIII, § 4; *Train v. New York*, 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); U.S. CONST. art. I, § 7; WASH. CONST. art. III, § 12; *United States v. Nixon*, 418 U.S. 683, 703-05, 94 S. Ct. 3090, 41 L. Ed 2d 1039 (1974); *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 9, 211 P.2d 651 (1949), *overruled prospectively by State ex rel. Wash. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 384 P.2d 833 (1963); *Ex Parte Grossman*, 267 U.S. 87, 119-20, 45 S. Ct. 332, 69 L. Ed. 527 (1925)).

perform an act required by law as part of that official's duties."). In this way, mandamus is equally a command of the law and a command of this court. As we explained in one of our earliest mandamus cases:

> [T]he writ which must necessarily issue under a petition of this kind . . . is no more effective than the statute. Each equally commands the officer to perform his duty. One is the announcement of the law by the law making power, the other is the announcement of the law by the court.

*State ex rel. Hawes v. Brewer*, 39 Wash. 65, 68-69, 80 P. 1001 (1905). A writ of mandamus can only command what the law itself commands. If the law does not require a government official to take a specific action, neither can a writ of mandamus. *See State ex rel. Taylor v. Lawler*, 2 Wn.2d 488, 490, 98 P.2d 658 (1940) ("The jurisdiction given to this court by the state constitution in Art. IV, § 4, to issue writs of mandamus to state officers, does not authorize [us] to assume general control or direction of official acts.").

Because a writ of mandamus can require only what the law requires, mandamus cannot control the discretion that the law entrusts to an official. *See SEIU Healthcare 775NW v. Gregoire*, 168 Wn.2d 593, 599, 229 P.3d 774 (2010) ("'[M]andamus may not be used to compel the performance of act or duties which involve discretion on the part of a public official.'" (quoting *Walker*, 124 Wn.2d at 410)). Mandamus, therefore, is an appropriate remedy only "'[w]here the law prescribes and defines the duty to be performed with such precision and certainty as

to leave nothing to the exercise of discretion or judgment.'" *Id.* (emphasis omitted) (quoting *State ex rel. Clark v. City of Seattle*, 137 Wash. 455, 461, 242 P. 966 (1926)). The manner of carrying out duties "which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury*, 5 U.S. at 170; *see Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) ("[T]he power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches.").

"We will not usurp the authority of the coordinate branches of government" by dictating how they must exercise their discretion. *Walker*, 124 Wn.2d at 410. Doing so would embody "the encroachment or aggrandizement of one branch at the expense of the other," which the separation of powers is designed to "safeguard against." *Buckley*, 424 U.S. at 122. "[T]he fundamental functions of each branch [are] inviolate"—the judicial branch cannot "'threaten[] the independence or integrity or invade[]'" the powers of the executive through a writ of mandamus or any other mechanism. *Carrick*, 125 Wn.2d at 135 (quoting *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975)); *see Marbury*, 5 U.S. at 170 ("The province of the court is . . . not to enquire how the executive, or executive officers, perform duties in which they have a discretion."). The very legitimacy of the writ of mandamus in our constitutional system depends on its narrow nature—our job is to say what the

law is, not to dictate how another branch should do its job. *See Brown*, 165 Wn.2d at 719 ("[T]he judiciary [must] not be drawn into tasks more appropriate to another branch.").

As this long history of precedent illustrates, there are thus "strict limits on the circumstances under which we will issue the writ [of mandamus] to public officers." *SEIU Healthcare 775 NW*, 168 Wn.2d at 599. Besides showing a government official has a clear duty to act, RCW 7.16.160, those seeking the writ must show they have no "plain, speedy and adequate remedy in the ordinary course of law" and that they are "beneficially interested," RCW 7.16.170. Petitioners bear "the 'demanding' burden of proving all three elements justifying mandamus." *Eugster v. City of Spokane*, 118 Wn. App. 383, 403, 76 P.3d 741 (2003) (quoting *Mallard v. U.S. Dist. Court*, 490 U.S. 296, 309, 109 S. Ct. 1814, 104 L. Ed. 2d 318 (1989)).

These petitioners have failed to meet their burden. They ask us to command Governor Inslee and Secretary Sinclair to release about 13,000 inmates housed in Washington's correctional facilities, based on particular categories, but they do not identify any clear duty the governor and secretary have failed to carry out.[6] Instead,

---

[6] The dissent suggests the petitioners are not seeking the blanket release of these inmates but, instead, are asking us to "direct DOC [(Department of Corrections)] to prioritize the release of vulnerable inmates while recognizing DOC's appropriate authority to consider other factors like public safety." Dissent at 4. But this characterization of petitioners' request does nothing to advance their cause. "[T]he remedy of mandamus contemplates the necessity of indicating the precise thing to be done" and "'will not lie to

the petitioners argue that "a variety of constitutional and statutory sources" impose on the governor and secretary a duty to "take all reasonable steps to protect people in prison from COVID-19." *See* Pet'rs' Br. in Supp. of Pet. for a Writ of Mandamus at 30. According to the petitioners, "release is the only actual 'reasonable'" step respondents could take to protect inmates form COVID-19. *Id.* at 53. But because no law commands the governor and secretary to release inmates here, neither can a writ of mandamus. Commanding the governor or the secretary to take specific actions not required by law would exceed this court's constitutional authority.

The executive branch has historically led Washington's response to emergencies. "The proclamation of an emergency and the Governor's issuance of executive orders" to address that emergency "are by statute committed to the sole discretion of the Governor." *Cougar Bus. Owners Ass'n v. State*, 97 Wn.2d 466, 476, 647 P.2d 481 (1982), *overruled in part by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). The law empowers the governor to "proclaim a

---

compel a general course of official conduct.'" *Walker*, 124 Wn.2d at 407-08 (citing *Clark County Sheriff v. Dep't of Soc. & Health Servs.*, 95 Wn.2d 445, 450, 626 P.2d 6 (1981), and quoting *State ex rel. Pac. Am. Fisheries v. Darwin*, 81 Wash. 1, 12, 142 P. 441 (1914)). And that is precisely what the dissent would grant: "a writ could direct relief that does not interfere with the discretion of the executive branch but mandates that discretion be exercised within constitutional limits." Dissent at 6-7. "It is hard to conceive of a more general mandate than to order a state officer to adhere to the constitution. We have consistently held that we will not issue such a writ." *Walker*, 124 Wn.2d at 408. We do so again today.

state of emergency" in response to a disaster which threatens "life, health, property, or the public peace." RCW 43.06.010(12). An emergency proclamation unlocks "the powers granted the governor during a state of emergency." *Id.* Those emergency powers are broad and include the authority to prohibit "[a]ny number of persons . . . from assembling," RCW 43.06.220(1)(b), "to waive or suspend" "any statute, order, rule, or regulation [that] would in any way prevent, hinder, or delay necessary action in coping with the emergency," RCW 43.06.220(2)(g), to "order the state militia . . . to assist local officials to restore order," RCW 43.06.270, and more. "These statutory powers evidence a clear intent by the Legislature to delegate requisite police power to the Governor in times of emergency." *Cougar Bus. Owners Ass'n*, 97 Wn.2d at 474.

The governor's response to an emergency "is clearly one of those discretionary acts that are 'in their nature political, or which are, by the constitution and laws, submitted to the executive,' and inappropriate for mandamus." *SEIU Healthcare 775NW*, 168 Wn.2d at 600 (quoting *Marbury*, 5 U.S. at 170); *see* RCW 43.06.010(12) ("The governor *may* . . . proclaim a state of emergency." (emphasis added)), .220(1)(b) ("The governor . . . *may* . . . issue an order prohibiting [a]ny number of persons, *as designated by the governor*, from assembling." (emphasis added)), .220(2) ("The governor . . . *may* . . . issue an order or orders concerning

waiver or suspension of statutory obligations." (emphasis added)), .270 ("The governor *may in his or her discretion* order the state militia . . . to assist local officials to restore order." (emphasis added)).[7]

Governor Inslee has exercised his discretion under these emergency powers dozens of times since proclaiming a state of emergency. Most relevant here, the governor has taken steps to accelerate the release of 950 nonviolent inmates who were set to be released this summer. *See* Proclamation, *supra*; Wash. Gov. Jay Inslee, Emergency Commutation in Response to COVID-19 (Apr. 15, 2020), https://www.governor.wa.gov/sites/default/files/COVID-19%20-%20Commutation %20Order%204.15.20%20%28tmp%29.pdf?utm_medium=email&utm_source=go vdelivery [https://perma.cc/PY9P-3YK9]. By May 15, the Department reported 422 inmates had received commutation orders and another 528 had been placed in the community through the rapid reentry program established under the governor's

---

[7] The dissent accuses us of "abdicating [our] responsibility" to "decide whether challenged acts or omissions violate the constitution" by "invok[ing] separation of powers" and "defer[ring] to the executive," as the United States Supreme Court did in its repudiated decision upholding the incarceration of Japanese Americans during World War II. Dissent at 1-2 (citing *Korematsu v. United States*, 323 U.S. 214, 65 S. Ct. 193, 89 L. Ed. 194 (1944), *abrogated by Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018)). This inaccurate and inflammatory accusation sheds more heat than light. The *Korematsu* decision endorsed the mass incarceration of law-abiding Americans based on their Japanese heritage, on grounds that had little to do with the separation of powers and everything to do with racism. It is unfair to equate that case with our recognition here of the governor's and secretary's discretion in implementing emergency measures to mitigate the risk of COVID-19 to those lawfully incarcerated in Washington's prisons.

proclamations. Memorandum from Stephen Sinclair, Sec'y of the Wash. Dep't of Corr., to All Incarcerated Individuals (May 15, 2020), https://www.doc.wa. gov/news/2020/docs/2020-0515-incarcerated-individual-memo-prison-population-reduction-efforts.pdf [https://perma.cc/2FYQ-NQHS].

The petitioners argue that this action does not go far enough and that the governor must release thousands more inmates to protect them from COVID-19. But like the governor's emergency powers, the governor's power to release inmates by commuting sentences or pardoning offenders is exclusive and discretionary. *See* WASH. CONST. art. III, § 9 ("The pardoning power shall be vested in the governor under such regulations and restrictions as may be prescribed by law."); RCW 10.01.120 ("[T]he governor . . . *may* . . . commute a sentence or grant a pardon, upon such conditions, and with such restrictions, and under such limitations *as he or she may think proper* . . . . The governor *may* also, on good cause shown, grant respites or reprieves from time to time *as he or she may think proper*." (emphasis added)). Because the constitution and laws of our state entrust the governor with the discretion to pardon those offenders and commute those sentences that he thinks proper, this court has no power to dictate how the governor may exercise that discretion—even in an emergency. *See Brown*, 165 Wn.2d. at 725 ("Directing the

performance of a discretionary duty would 'usurp the authority of the coordinate branches of government.'" (quoting *Walker*, 124 Wn.2d at 410)).

The administration of correctional institutions is also an undeniably executive function. *See Robinson v. Peterson*, 87 Wn.2d 665, 669, 555 P.2d 1348 (1976) ("Questions concerning the rights of inmates of prisons and the duties of their custodians have not been frequently before this court. This should not be surprising, since the administration of the state institutions and county jails is an executive function and not a judicial one."). To avoid offending the separation of powers, we have long fought to ensure Washington's courts are not "drawn into tasks more appropriate to another branch," including prison administration. *Brown*, 165 Wn.2d at 719; *see also In re Pers. Restraint of Dyer*, 143 Wn.2d 384, 393, 20 P.3d 907 (2001) ("It is not in the best interest of the courts to involve themselves in the 'day-to-day management of prisons.'" (quoting *Sandin v. Conner*, 515 U.S. 472, 482, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995))).

The petitioners ask us to command the executive branch to exercise its emergency powers, its commutation and pardon powers, and its powers to administer Washington's correctional facilities to immediately release thousands of inmates. But "[w]e will not"—and, consistent with the separation of powers, cannot—"usurp the authority of the coordinate branches of government" by dictating

how the executive branch must exercise these discretionary powers. *Walker*, 124 Wn.2d at 410. The constitution empowers us "to say what the law is," but it does not empower us to dictate "how the executive, or executive officers, perform duties in which they have a discretion." *Marbury*, 5 U.S. at 177, 170.

Interfering with the governor's choices in responding to this emergency would contravene the historical roles of the executive and judicial branches. Absent a clear mandate for more specific action on the governor's part, we have no authority to oversee the governor's many discretionary actions to address the COVID-19 outbreak. While we do not minimize the serious risks COVID-19 poses to Washington's incarcerated population, we will not use this emergency as an occasion to wield powers that exceed our constitutional authority. For these reasons, we deny and dismiss the petition for a writ of mandamus.

## II. THE PETITIONERS HAVE NOT SHOWN "DELIBERATE INDIFFERENCE" TO SUPPORT RELIEF UNDER A PERSONAL RESTRAINT PETITION, SO THEIR MOTION TO AMEND IS FUTILE

Following the court's April 10, 2020 order on the petitioners' emergency motion, the petitioners brought a motion to amend their petition to add a personal restraint petition claim. Even setting aside the procedural hurdles to consideration of such a claim,[8] allowing the amendment would be futile because the petitioners

---

[8] For example, there is no authority for the proposition that a personal restraint petition may be filed by more than one petitioner. We do not reach that question here.

cannot show that they suffer from unlawful restraint. The personal restraint petition is the procedure by which original actions are brought in the appellate courts of Washington to obtain collateral or postconviction relief from criminal judgments and sentences, and other forms of government restraint, such as civil commitment and prison discipline. Governed by the procedures set forth in Title 16 RAP, a personal restraint petition is the vehicle for seeking relief that was formerly available by petition for writ of habeas corpus or other postconviction motion. RAP 16.3. This court and the Court of Appeals have concurrent original jurisdiction over such petitions. RAP 16.3(c).

As the name of the action implies, a personal restraint petition is designed to obtain relief from an "unlawful restraint." The petitioners here are clearly under restraint, as they are confined and serving terms of imprisonment. *In re Pers. Restraint of Stuhr*, 186 Wn.2d 49, 52, 375 P.3d 1031 (2016). But to succeed, the petitioners must show that their confinement is "unlawful." Only unlawful prison conditions constitute a basis for granting a personal restraint petition. RAP 16.4(c)(6).[9] The petitioners mainly argue that the substantial risk caused by COVID-19 makes their imprisonment cruel or unusual.

---

[9] Lawsuits challenging prison conditions are generally litigated in civil rights or declaratory judgment actions. We are aware of a pending action for declaratory and injunctive relief in *Nagel v. Department of Corrections*, Pierce County Superior Court cause number 20-2-05585-4, making similar prison conditions arguments. A relevant

The petitioners rely on article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution, but do not argue for an independent state constitutional analysis on their prison conditions claims. As a result, we apply the Eighth Amendment standards requiring a showing of a substantial risk of serious harm and deliberate indifference to that risk. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). As the facts described above show, the petitioners face a substantial risk of serious harm. Petitioners' counsel persuasively noted at oral argument that, in prison and jail facilities, inmates live in close confinement with one another with no real choice as to social distancing or other measures to control spread of the virus. The risk of a COVID-19 outbreak is undeniably high in these facilities and under these conditions.

But it is not sufficient for the petitioners to show a substantial risk of serious harm. Under well-established precedent, obtaining judicial relief also requires showing that the respondents have acted with "deliberate indifference" to that risk. *Farmer*, 511 U.S. at 832. Under this constitutional standard, the record must evidence subjective recklessness or deliberate indifference; that is, the official must know of and disregard the risk. *Id.* at 837. Repeated negligent acts demonstrating

___

inquiry in considering a personal restraint petition is whether the petitioner has other adequate recourse through such an action, but because we do not grant the motion to amend, we need not decide whether another remedy is available to these petitioners. *See* RAP 16.4(d) (limiting relief to where other remedies are inadequate).

systemic deficiencies in the method of providing protections may amount to deliberate indifference. *See Kelley v. McGinnis*, 899 F.2d 612, 616-17 (7th Cir. 1990).

Here, the record does not show the respondents have acted with deliberate indifference. And there is no indication that extending this court's initial preservation order would help identify any such indifference. The governor has issued proactive orders to reduce prison populations and to protect offenders incarcerated in prison. The Department has implemented a multifaceted strategy designed to protect offenders housed at various facilities, increasing those protections as more information becomes available about the virus and its risks. Part of that strategy includes a release of some nonviolent offenders. The petitioners imply that any plan that does not lead to their own personal release is insufficient, but this is simply a difference of opinion in how to best fight the threat of COVID-19 in prisons.

While reasonable minds may disagree as to the appropriate steps that should be taken to protect the prison population while preserving public safety, no evidence here shows that the respondents have acted with deliberate indifference. The result might be different on different facts, and we do not suggest the inadequacy of safety measures can never amount to deliberate indifference. On this record, however, the

petitioners cannot show unlawful restraint to support a personal restraint petition and thus granting their motion to amend would be futile. *See Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 142, 937 P.2d 154 (1997) (court may deny leave to amend complaint where a "[new] claim would have been futile"). As a result, we deny the motion to amend and dismiss the petition.[10]

## CONCLUSION

Consistent with our limited authority to compel only mandatory, nondiscretionary action by another branch of government, we deny the petitioners' claims for extraordinary judicial relief. We are not indifferent to the serious dangers faced by petitioners and other inmates at heightened risk of contracting COVID-19 in Washington's correctional facilities, but how the governor and secretary address these dangers and also protect the public necessarily involves the exercise of discretionary authority that we cannot direct. Even if we could do so, nothing before us suggests how we would succeed where those charged with running Washington's correctional system have failed. Today's decision resolves these claims on the facts before us and does not excuse the governor and secretary from their continuing obligations toward these petitioners and other inmates. At the same time, we will

---

[10] The petitioners originally also argued claims arising under article I, section 12 of the Washington Constitution and the Washington Law Against Discrimination, RCW 49.60.030. But all subsequent argument has focused on federal Eighth Amendment standards. The petitioners have shown no constitutional or statutory basis for relief.

not excuse ourselves from our obligation to respect the discretion vested in another

branch of government and uphold the constitutional separation of powers.

Stephens, C.J.

WE CONCUR:

Johnson, J.

Madsen, J.

Owens, J.

Worswick, JPT

No. 98317-8

GONZÁLEZ, J. (dissenting) — When this case was filed, the COVID-19 virus (coronavirus disease) was spreading throughout our state, nation, and world, creating a public health emergency unprecedented in living memory. The resulting fear and anxiety, coupled with the need to take distancing measures, caused massive disruption in our daily lives and institutions. The courts have a role to play in protecting individual rights in times of emergency. It is true that we must not usurp the essential functions of another branch of government. But we too have an essential function: to say what the law is, to say whether the law has been violated, and to order relief when relief is warranted.

If we are to fulfill our essential judicial function, we must decide whether challenged acts or omissions violate the constitution, even when making that decision is difficult. And we must learn from our history—a history which shows that in times of distress, courts all too often defer to the executive branch and sacrifice precious liberties, especially for our most vulnerable. In *Korematsu v.*

1

*United States*, for example, amidst fear in a time of war, the judicial branch sanctioned a repulsive, unjustified racial classification that led to enormous suffering authorized by an executive order. 323 U.S. 214, 215, 65 S. Ct. 193, 89 L. Ed. 194 (1944), *abrogated by Trump v. Hawaii*, __ U.S. __, 138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018); *see Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984) (granting a postconviction writ of coram nobis 40 years later vacating Mr. Korematsu's conviction). This tragic history stands as a caution that in times of crisis, the judiciary must not invoke separation of powers to avoid subjecting government actions to close scrutiny and accountability. Because the majority has abdicated this responsibility with its near-summary dismissal of the petitioners' claims, I dissent.

The petitioners are five individuals incarcerated in Department of Corrections (DOC) facilities where the State is responsible for their safety during this public health emergency. Because prisons are cramped and crowded environments, petitioners are at an increased risk of contracting COVID-19, and serious outbreaks of this deadly disease have already occurred in multiple prisons, putting inmates, staff, and the community at risk. As of July 16, 2020, there have been at least 651 deaths from coronavirus reported among prisoners across our country, including several in Washington State. *A State-by-State Look at Coronavirus in Prisons*, THE MARSHALL PROJECT,

https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-

coronavirus-in-prisons (last visited July 16, 2020); NWPB News, *2nd Inmate Dies,*

*National Guard Deployed To Help with COVID Testing at Eastern Washington*

*Prison*, SPOKANE PUBLIC RADIO (June 26, 2020),

https://www.spokanepublicradio.org/post/2nd-inmate-dies-national-guard-

deployed-help-covid-testing-eastern-washington-prison. Our federal constitution,

by prohibiting "cruel and unusual punishment," requires state officials to take

reasonable measures to protect the people in their custody from contracting the

virus. U.S. CONST. amend. VIII; *see Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.

Ct. 1970, 128 L. Ed. 2d 811 (1994); *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.

Ct. 2475, 125 L. Ed. 2d 22 (1993); *Martinez-Brooks v. Easter*, No. 3:20-CV-00569

(MPS), 2020 WL 2405350, at *20-26 (D. Conn. May 12, 2020).

This responsibility is well established.

> "[W]hen the State takes a person into its custody and holds him there against
> his will, the Constitution imposes upon it a corresponding duty to assume
> some responsibility for his safety and general well being. . . . The rationale
> for this principle is simple enough: when the State by the affirmative
> exercise of its power so restrains an individual's liberty that it renders him
> unable to care for himself, and at the same time fails to provide for his basic
> human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable
> safety—it transgresses the substantive limits on state action set by the Eighth
> Amendment."

*Helling*, 509 U.S. at 32 (alterations in original) (quoting *DeShaney v. Winnebago*

*County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d

249 (1989)); *see Brown v. Plata*, 563 U.S. 493, 510, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011). Our state constitution also prohibits "cruel punishment," and we have repeatedly found our cruel punishment clause is more protective than the Eighth Amendment. WASH. CONST. art. I, § 14; *see State v. Bassett*, 192 Wn.2d 67, 78-82, 428 P.3d 343 (2018) (collecting cases).

The petitioners filed this mandamus action arguing the response of state officials to the COVID-19 emergency in prisons was constitutionally inadequate. They argued social distancing is not possible in prisons at the current population levels and asked for a writ of mandamus directing the governor and the DOC secretary to use their powers to significantly reduce the prison population. At oral argument, the petitioners made clear they were not seeking the blanket release of any particular group. They are not seeking a blanket release of all individuals over age 50, of all individuals with serious underlying medical conditions, or of all individuals with early release dates within the next 18 months. Rather, they ask this court to direct DOC to prioritize the release of vulnerable inmates while recognizing DOC's appropriate authority to consider other factors like public safety in determining how to sufficiently reduce the prison population to allow safe distancing of inmates and staff. Whether this relief is available in mandamus is a difficult question that deserved due scrutiny.

But by order issued the day of oral argument, a majority of this court summarily dismissed the petition and denied the petitioners' request to seek similar relief via a personal restraint petition. In the opinion published today, the majority explains its view that a writ of mandamus was not available because no statute specifically requires a reduction of the prison population during the pandemic, and the use of emergency powers to protect the health of inmates requires the governor and DOC secretary to exercise discretion. According to the majority, our hands are tied by "long recognized separation of powers principles." Majority at 2.

Separation of powers does not mandate the majority's conclusion. Our constitutional system divides power among three different branches of government to prevent tyranny and protect liberty. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009). Each branch has its own appropriate sphere of activity and inviolate fundamental functions. *Id.* (citing Philip A. Talmadge, *Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems*, 22 SEATTLE U. L. REV. 695 (1999); *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)). But separation of powers does not call for the branches of government to be entirely "'sealed off from one another.'" *Id.* (quoting *Carrick*, 125 Wn.2d at 135). Instead it recognizes that they must remain partially intertwined to effectively check and balance each other. *Id.* While it is an executive branch function to decide whether, when, and how to exercise

5

emergency powers amidst a public health emergency, an emergency "is not a blank check for the [executive] when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004). During an emergency, our constitutional system "envisions a role for all three branches when individual liberties are at stake." *Id.* It remains the judicial function to declare unconstitutional that which transgresses the rights of individuals in our state.

Consistent with these principles, Washington law authorizes a writ of mandamus to compel a public official to perform a mandatory nondiscretionary duty or to correct a clear and manifest abuse of discretion. *Brown v. Owen*, 165 Wn.2d 706, 726-27, 206 P.3d 310 (2009) (citing *Walker v. Munro*, 124 Wn.2d 402, 411, 879 P.2d 920 (1994)); *State ex rel. Reilly v. Civil Serv. Comm'n*, 8 Wn.2d 498, 501-04, 112 P.2d 987 (1941); *State ex rel. Beffa v. Superior Court*, 3 Wn.2d 184, 187, 100 P.2d 6 (1940); *State v. Superior Court*, 59 Wash. 670, 673, 110 P. 622 (1910). If the petitioners show unconstitutional acts or omissions by public officials that amount to a clear and manifest abuse of discretion, we may issue a writ of mandamus. *See Brown*, 165 Wn.2d at 726-27 (citing *Walker*, 124 Wn.2d 402); *State ex rel. Reilly*, 8 Wn.2d at 501-04; *State ex rel. Beffa*, 3 Wn.2d at 187. Under those circumstances, a writ could direct relief that does not interfere with the discretion of the executive branch but mandates that discretion be exercised

within constitutional limits. Washington law also authorizes us to grant relief for unconstitutional conditions of confinement via a personal restraint petition. RAP 16.4(c)(6).[1]

I cannot confidently say on the present record whether the petitioners are entitled to the relief they seek. The respondents have filed reports detailing their safety plan and steps taken to protect inmates from contracting COVID-19. According to these submissions, DOC has adopted protocols in an effort to follow United States Center for Disease Control and Prevention guidelines, has already implemented many of these protocols, and is in the process of implementing others. The governor and the secretary have also exercised their powers to facilitate the early release of some nonviolent offenders, bringing the prison population from approximately 18,000 to just over 16,000. These submissions show commitment to staff, inmates, and the community. But questions of fact remain that preclude a decision on the merits. For that reason, I would not order any relief on this record.[2]

---

[1] At this point I see no reason why CR 23 governing class certification would not apply where a sufficiently large number of prisoners claim similar harm. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010) (noting the Ninth Circuit has recognized that class actions may be brought pursuant to habeas corpus (citing *Mead v. Parker*, 464 F.2d 1108, 1112-13 (9th Cir. 1972))).

[2] After the court issued its order denying the petition for a writ of mandamus, several political organizations began spreading false information that the dissenting justices would have ordered state officials to immediately release mass numbers of serious violent offenders. That false information was spread through a social media campaign using images of the justices in a style reminiscent of "wanted" posters. Not surprisingly, the campaign incited harassment and

But I am confident that this court should not have summarily dismissed the petitioners' suit. This is hardly the first time a case has been filed before all the facts are established. Our court rules contemplate a situation like this where we need to resolve questions of fact before deciding the merits of a petition for a writ of mandamus or a personal restraint petition. *See* RAP 16.2(d), 16.11(a), 16.12. Instead of using these tools and others, the majority—in the name of separation of powers—tosses out the petitioners' claims without meaningfully scrutinizing whether the government is violating their basic liberties. Since the court's order, cases of COVID-19 in DOC facilities have continued to rise. Recently, positive cases at the Coyote Ridge Corrections Center (CRCC)—which is more than an hour away from community hospitals—doubled in a week, with 101 inmates and staff infected and 1,815 inmates exposed. *See* COVID-19 INFORMATION, Wash. Dep't of Corr., https://www.doc.wa.gov/news/covid-19.htm#testing (last visited June 11, 2020); Press Release, Wash. Dep't of Corr., Coyote Ridge Corrections Center Medium Security Complex on restricted movement to contain COVID-19 (June 11, 2020), https://www.doc.wa.gov/news/2020/06112020p.htm [https://perma.cc/64YR-3DCF].[3] We should have retained the matter, ordered the

threats toward the dissenting justices, with especially personal and hateful threats directed to the justices of color. Because of these threats, I feel it is important to take the extraordinary step of making clear that the information circulated was false, and no justice would have ordered such relief that day.

[3] Because the circumstances are rapidly developing, these numbers will undoubtedly be out of date by the time our opinion is filed.

State to provide an updated report, appointed a fact finder, allowed the petitioners

to amend their action, and given the petitioners' claims the scrutiny they deserve.  I

dissent.[4]

---

[4] On June 24, 2020, the petitioners filed (1) a motion to submit new relevant additional evidence in support of their petition for a writ of mandamus, (2) a motion for the appointment of a public health expert, and (3) a motion to expedite consideration of the first two motions.  They ask us to consider evidence about the current outbreak at the CRCC, including declarations from three people who are confined there.  According to these declarations, because of the outbreak, individuals are confined to their cells for 23.5 hours per day, and those confined in cells that lack toilets and water have had to urinate in bottles, or even soil themselves, while waiting hours for an escort to the bathroom.  *See* Decl. of Abdullahi Noor at ¶¶ 7-8; Decl. of Jason Streiff at ¶¶ 7-8.  The petitioners ask us to consider this new evidence about the CRCC outbreak and issue an order to show cause why an expert should not be appointed to investigate and evaluate the steps DOC is taking to protect the people in its custody.  I agree with the majority that expedited consideration of these requests is appropriate.  But I would go further.  Evidence that there has been a major outbreak at the CRCC is highly relevant to the petitioners' claim that DOC's policies and procedures, which it purports it is using in all of its facilities to mitigate the risk of harm from the virus, do not sufficiently mitigate that risk.  We should take this evidence into consideration, *see* RAP 9.11(a), and enter an order to show cause why an expert should not be appointed, *see* ER 706.

González, J.

Yu, J

Montoya-Lewis, J.

Gordon McCloud, J.