IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SINA GHODSEE, an individual,
through Litigation Guardian ad Litem,
JOSHUA BROTHERS,

          Appellant,

    and

SHAHRBANOO GHODSEE, an
individual,

          Plaintiff,

    v.

CITY OF KENT, a political subdivision
of the State of Washington, and KING
COUNTY, d/b/a King County Crisis and
Commitment Services,

          Respondents.

No. 82897-5-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, A.C.J. — Sina Ghodsee sued the City of Kent and King County for negligence based on their actions taken to detain him pursuant to a court order issued under the involuntary treatment act. Both defendants moved for summary judgment dismissal based on the public duty doctrine and statutory immunity, and trial court granted the motions. This court affirmed. Ghodsee petitioned for review by our Supreme Court, which stayed the petition pending its final decision in *Norg v. City of Seattle*, 200 Wn.2d 749, 522 P.3d 580 (2023). After issuance of that opinion, the Supreme Court remanded Ghodsee's case to this court for

reconsideration in light of *Norg*.  Because *Norg* is materially distinguishable, we do not change our opinion on reconsideration.

FACTS

In *Ghodsee v. City of Kent*, this court provided the underlying facts as follows:

On Friday, June 23, 2017, Shahrbanoo Ghodsee contacted King County Crisis and Commitment Services (KCCCS) with concerns about her son, Sina Ghodsee. Shahrbanoo reported Ghodsee was not taking his medication and was "agitated" and "delusional," and she had left the home to stay elsewhere. Four days later, a "Designated Mental Health Professional" (DMHP) called to schedule an appointment for a team of DMHPs to meet with Shahrbanoo at the Ghodsee home. The DMHPs intended to interview Ghodsee pursuant to the involuntary treatment act (ITA), but were unsuccessful and eventually left the home after Ghodsee pointed "what appeared to be a table leg at them like a gun." They called the police; officers from the Kent Police Department (KPD) responded and attempted to make contact with Ghodsee, but were similarly unsuccessful and disengaged. On Thursday, June 29, a DMHP filed a "Petition for Initial Detention (Non-Emergency)" in King County Superior Court, which the court granted.

On Friday, June 30 and again on Saturday, July 1, a team of DMHPs and several officers from KPD went back to the Ghodsee home but were ultimately unable to detain Ghodsee. On Sunday, July 2, KPD was dispatched to the Ghodsee home after a neighbor called law enforcement concerned that Ghodsee was threatening someone and possibly carrying a rifle. The caller could not state with any certainty that he saw a gun, and KPD never observed a crime, so the officers eventually left without attempting to contact Ghodsee. The next week, on Friday, July 7, KPD officers formulated a plan to take Ghodsee into custody when he left his home to get groceries or cigarettes. Around midnight on July 9, the manager at a local grocery store called KPD to inform them Ghodsee was on site, but by the time officers arrived Ghodsee had left.

On Monday, July 10, KPD received two emergency calls from Ghodsee's neighbors, reporting Ghodsee had shot at the neighbor's occupied home. KPD responded and saw Ghodsee in the window of his home with a rifle raised, pointed in the direction of the officers. Two officers simultaneously fired, and Ghodsee disappeared from sight. Officers on the scene used a drone to see inside of the home,

where they observed Ghodsee laying on the floor. Ghodsee was taken into custody. He sustained a gunshot wound to the head, surviving but suffering significant and life-changing injuries.

21 Wn. App. 2d 762, 766-67, 508 P.3d 193 (2022) (footnotes omitted), *remanded,* 1 Wn.3d 1001 (2023).

In 2020, Sina Ghodsee, through a guardian ad litem, and his mother filed a civil complaint against the City of Kent and King County for negligence. *Id*. at 765, 767. He contended that both governmental agencies failed to exercise reasonable care in detaining him pursuant to the ITA. *Id.* at 765-66. In 2021, the defendants moved for summary judgment based on the public duty doctrine and statutory immunity. *Id.* at 767. The trial court granted the motions and Ghodsee appealed. *Id*.

On appeal, Ghodsee argued that both the County and the City owed him an individualized duty of care. *Id.* at 768. He asserted that the County, through its DMHPs[1] owed him a duty of care pursuant to the special relationship exception to the public duty doctrine. *Id.* at 769-70. Based on the "limited role of the DMHP as defined by statute, and the brief relationship between Ghodsee and the specific DMHPs at issue," this court determined no "'definite, established, and continuing relationship'" arose and thus concluded no special relationship existed. *Id.* at 772. Ghodsee also argued that that the nonemergency detention (NED) order imposed a "take charge" duty on the County and City because it directed the DMHPs and KPD to detain him. *Id.* at 772-73. We disagreed, again highlighting the lack of an

---

[1] As noted in *Ghodsee*, "Subsequent amendments to the involuntary treatment act replaced the term 'Designated Mental Health Professional,' or DMHP, with 'Designated Crisis Responders' (DCRs)." 21 Wn. App. 2d at 766 n.3. We continue to use the terminology applicable at the time of the events in Ghodsee's case.

"ongoing, monitoring relationship," and explained that the order to detain Ghodsee created a general duty to the public rather than an individual duty to him. *Id.* at 774-75.

Further, this court analyzed the City's potential liability under the duty of law enforcement to exercise reasonable care. *Id.* at 775-76. In rejecting Ghodsee's claim that the KPD breached that duty by not detaining him sooner after the issuance of the NED order, this court noted that law enforcement's duty of care necessarily entails the exercise of discretion "to determine the safest way to carry out the court's order," nothing in the ITA statute or NED order imposed a duty to detain him by means of a particular method or within a certain timeframe, and the NED order did "not function as a warrant or otherwise suspend Ghodsee's individual rights protected by warrant requirements." *Id.* at 776-78. Finally, this court considered Ghodsee's challenge to the trial court's finding that the defendants were entitled to statutory immunity under RCW 71.05.120. *Id.* at 779. "Because the plain language of the statute provides immunity for actions as well as decision-making," this court held that "both the City and County are entitled to statutory immunity for their actions 'with regard to' the decision to detain." *Id.* at 780 (quoting former RCW 71.05.120(1) (2016)). As Ghodsee failed to show that either entity owed him an individualized duty of care as a matter of law, this court affirmed summary judgment in favor of the defendants. *Id.* at 782.

Ghodsee petitioned for review by our Supreme Court and that petition was stayed pending the final decision in *Norg v. City of Seattle*, 200 Wn.2d 749, 522

P.3d 580 (2023) (*Norg* II).[2]  On April 5, 2023, the court issued an order that remanded Ghodsee's case to this court for reconsideration in light of *Norg* II.  Ord., *Ghodsee v. City of Kent,* No. 100892-9 (Wash. Apr. 5, 2023).  On August 10, 2023, this court directed the parties to submit supplemental briefing on the applicability of *Norg* II to the facts and issues of this case.[3]

ANALYSIS

Ghodsee contends that "*Norg* [II] shows that this [c]ourt misapplied the public duty doctrine" in his case.  *Norg* II does no such thing.

*Norg* II addressed whether the public duty doctrine applied to the City of Seattle in its response to a 911 call which the Norgs alleged was negligent.  200 Wn.2d at 752.  Delaura Norg[4] woke up to find her husband, Fred, unresponsive and making loud noises.  *Id.* at 753.  She called 911, spoke with a dispatcher who the court noted was employed by the Seattle Fire Department (SFD), and provided the dispatcher with their home address.  *Id.*  The 911 dispatcher assigned three units from two nearby SFD stations and gave them the correct address, which was

---

[2] In supplemental briefing, Ghodsee notes that he did not seek Supreme Court review of this court's affirmance of summary judgment as to his claims against King County based on the actions, or inaction, of the DMHPs.  The County also acknowledges this procedural posture and contends that the portion of the *Ghodsee* opinion that affirmed dismissal of his claims against the County is final.  Accordingly, we only consider the applicability of *Norg* II as it relates to the City through the KPD.

[3] Following this court's directive to the parties calling for supplemental briefing on the applicability of *Norg* II, the County complied and submitted a brief.  The County's brief begins with a paragraph acknowledging the relevant procedural facts, including the fact that Ghodsee did not appeal summary judgment as to the County, and then complied with the order to analyze the applicability of *Norg* II.

On August 28, 2023, Ghodsee filed a motion to strike the County's supplemental brief pursuant to RAP 10.7 and requested sanctions against it.  Essentially, Ghodsee asks us to sanction the County for strictly complying with an order issued by this court.  Ghodsee's reasoning on this matter is unavailing and his motion for sanctions is denied.

[4] Because the Norgs share the same last name, we refer to them by their first names as needed for clarity.  No disrespect is intended.

only three blocks from the nearest station. *Id.* While the dispatcher assured Delaura that the units were on the way to their apartment, all three of the dispatched units drove past the Norgs' apartment and went to a nearby nursing home they assumed had been the source of the 911 call. *Id.* After the units realized they were at the wrong address, they went back to the Norgs' apartment building and "reached the Norgs approximately 16 minutes after Delaura began speaking with the 911 dispatcher." *Id.* at 753-54. Ultimately, Fred was diagnosed with a heart attack and the Norgs sued the City, alleging its employees were negligent in responding to the medical emergency. *Id.* at 754. The City asserted the public duty doctrine as an affirmative defense, but the trial court ruled that it did not apply. *Id.* at 754-55. On interlocutory review, this court affirmed.[5] *Id.* at 755. Our Supreme Court then granted discretionary review. *Id.*

On review, the Supreme Court reiterated that "a government entity's breach of a duty owed to the general public cannot sustain a tort claim for negligence as a matter of law." *Id.* at 757. "[T]he public duty doctrine provides 'a mechanism for focusing upon whether a duty is actually owed to an individual claimant rather than the public at large.'" *Id.* at 758 (quoting *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 304-05, 669 P.2d 468 (1983), *overruled on other grounds by Meaney v. Dodd*, 111 Wn.2d 174, 759 P.2d 455 (1988)). Put simply, the court explained, "If the duty that the government allegedly breached was owed to the public at large, then the

---

[5] "Because the duty at issue in this case is not a public duty owed to the general public at large but is instead a common law duty to exercise reasonable care in providing emergency medical services, the public duty doctrine does not apply and the trial court did not err in so concluding." *Norg v. City of Seattle*, 18 Wn. App. 2d 399, 413, 491 P.3d 237 (2021), *aff'd*, 200 Wn.2d 749, 522 P.3d 580 (2023) (*Norg* I).

public duty doctrine applies; if the duty was owed to an individual, then the public duty doctrine does not apply." *Id.* However, the court noted, the public duty doctrine is not applicable to all tort claims against governmental entities whose duty was to the individual plaintiff; it "applies only to claims based on an alleged breach of 'special governmental obligations that are imposed by statute or ordinance.'" *Id.* (quoting *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 549, 442 P.3d 608 (2019)).

The Norgs argued that the public duty doctrine was inapplicable because the City owed them an individual duty to exercise reasonable care once "the City, through its dispatcher, established a direct and particularized relationship" with them. *Id.* at 763. The court extensively highlighted the interaction giving rise to this duty, "Delaura Norg expressly requested help, remained on the phone with the 911 dispatcher for over 15 minutes, was assured by the dispatcher that medical aid was on the way, and confirmed her address to the dispatcher multiple times." *Id.* at 762. Accordingly, the court determined that the City owed the Norgs, individually, a common law duty of reasonable care pursuant to the rescue doctrine, which "'arises when one party voluntarily begins to assist an individual needing help.'" *Id.* at 763 (quoting *Folsom v. Burger King*, 135 Wn.2d 658, 674-75, 958 P.2d 301 (1998)). The court further noted that "[s]uch a claim could certainly arise against a private ambulance service, given that 'emergency medical assistance is not a unique function of government.'" *Id.* at 765 (footnote omitted) (quoting *Cummins v. Lewis County*, 156 Wn.2d 844, 872, 133 P.3d 458 (2006) (Chambers, J., concurring)). Because the "Norgs' claim was based on the City's

alleged breach of its common law duty to exercise reasonable care when responding to their call for emergency medical assistance," the court held that the public duty doctrine did not apply and affirmed without considering any of the doctrine's exceptions. *Id.* at 765-66.

*Norg* II is materially distinguishable and does not impact this court's holding in *Ghodsee*. In *Norg* II, the City of Seattle was not engaged in "'a unique function of government,'" rather, it was operating an emergency ambulance service, circumstances wherein private providers of those same services "'have historically been subjected to civil suit for negligence.'" *Id.* at 765 (first quoting *Cummins*, 156 Wn.2d at 872 (Chambers, J., concurring); and then quoting *Norg v. City of Seattle*, 18 Wn. App. 2d 399, 409, 491 P.3d 237 (2021) (*Norg* I)). However, in *Ghodsee*, the City was operating a police department and our opinion was based, in part, on the premise that "providing police protection is an inherent government function." *Norg* I, 18 Wn. App. 2d at 409-10. Far from a proprietary function, providing security to the community in the interest of public safety has been said to be "'the most basic function of any government,'" and "the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 312, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972) (quoting *Miranda v. Arizona*, 384 U.S. 436, 539, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (White, J., dissenting)); *Thornhill v. Alabama*, 310 U.S. 88, 105, 60 S. Ct. 736, 84 L. Ed. 1093 (1940). As such police functions are inherently governmental, it is unsurprising that Ghodsee identifies no case in which a private entity has been held liable for negligence in

its failure to seize or detain an individual pursuant to a non-emergent detention order.

Even in medieval England before police forces—as we have come to understand them—had been established, the duties of law enforcement were governmental by nature as the king relied upon local officials to serve in those roles. *See* David J. Seipp, *The Distinction Between Crime and Tort in the Early Common Law*, 76 B.U. L. Rev. 59, 64 (1996). After the Norman Conquest in 1066, English sheriffs acted as the king's local agents and it was their duty to be "'the keeper of the king's peace.'" *McMillian v. Monroe County,* 520 U.S. 781, 793, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997) (quoting 1 William Blackstone, Commentaries on the Laws of England 328, 332 (1765)). "As the basic forms of English government were transplanted in our country, it also became the common understanding here that the sheriff . . . was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace." *Id.* at 794 (footnote omitted).

Initially, the colonies relied on "[n]ight watches, constables, and sheriffs" to maintain the peace, but "'by the late 1880s, all major U.S. cities had municipal police forces in place.'" *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 226-27 (quoting Olivia B. Waxman, *How the U.S. Got Its Police Force*, TIME (May 18, 2017), https://time.com/4779112/police-history-origins), *modified by Alsaada v. City of Columbus*, No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021). Today, cities are statutorily obligated to "provide police services, enforce the law, and keep the peace." *Beltran-Serrano*, 193 Wn.2d at 552. As our

Supreme Court recently reiterated, "[t]he legislative branch writes laws, WASH. CONST. art. II, § 1, the executive branch faithfully executes those laws, WASH. CONST. art. III, § 5, and 'it is emphatically the province and duty of the judicial department to say what the law is.'" *Colvin v. Inslee*, 195 Wn.2d 879, 892, 467 P.3d 953 (2020) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803)). Law enforcement is a fundamental function of the executive branch and the constitution "does not empower us to dictate 'how the executive, or executive officers, perform duties in which they have a discretion.'" *Id.* at 898 (quoting *Marbury*, 5 U.S. at 170). In other words, from the king at common law to the elected executive today, the duties of enforcing the law and preserving the peace have remained an exclusive function of the State.

*Norg* II is also distinguished on the basis of the City's duty, which is glaringly absent here. The City of Seattle's duty to exercise reasonable care to the Norgs individually arose from the 15-minute-long "direct and particularized interaction" between Delaura and the 911 dispatcher, during which the dispatcher expressly assured her that medical aid for Fred was on the way. *Id.* at 760-62. Conversely, in *Ghodsee*, there was no sustained direct and/or particularized interaction between Sina and the KPD officers and the City provided neither Sina nor his mother an express assurance or promise to aid. The only interactions between the Ghodsee family and the KPD officers occurred on June 23, when officers unsuccessfully attempted to contact Sina, and on June 30 and July 1, when several officers went to the Ghodsee house to effectuate the NED order but were unable to detain Sina. *Ghodsee*, 21 Wn. App. 2d at 766-67. Thus, the basis of the

individualized common law duty to exercise reasonable care, that was established in *Norg* II when the City of Seattle took steps to provide aid, is not present here.[6] Ghodsee effectively seeks, without characterizing it in this manner, a broad duty to act.

While Ghodsee insists that "Sina's claim is no different" than that of the Norgs, their respective claims against the government entities are fundamentally distinct and Ghodsee's attempt to stretch the holding of *Norg* II to apply to his case is without merit. Because the KPD did not owe Ghodsee an individualized duty of care, his negligence claim against the City fails as a matter of law. Accordingly, our analysis and holding in *Ghodsee* remain unchanged after reconsideration.

Affirmed.

_____
Hazelrigg, A.C.J.

WE CONCUR:

_____          _____
Coburn, J.                                                      Dwyer, J.

---

[6] At oral argument before this court, Ghodsee argued for the first time that the interactions between the King County DMHPs and the Ghodsee family gave rise to an actionable duty by the City of Kent, via the KPD, to exercise reasonable care to Ghodsee individually. Wash. Ct. of Appeals oral argument, *Ghodsee v. City of Kent*, No. 82897-5-I (Nov. 9, 2023), at 7 min., 50 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111142/?eventID=2023111142.

Despite an affirmative statement to the contrary, Ghodsee's new theory was not presented in briefing at any stage in this case and it is wholly unsupported by any reference to authority. This court "will decide a case only on the basis of issues set forth by the parties in their briefs." RAP 12.1(a). And we "will not consider an issue raised for the first time during oral argument where there is no argument presented on the issue and no citation to authority provided." *State v. Olson,* 126 Wn.2d 315, 320, 893 P.2d 629 (1995). Because Ghodsee's novel argument was not raised in briefing and is unsupported by any citation to authority, we decline to reach the merits.