# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 54629-9-II |
| ROBERT RUFUS WILLIAMS, | |
| Petitioner. | PUBLISHED OPINION |

GLASGOW, J.—Robert Rufus Williams seeks relief from restraint imposed following his convictions for burglary, robbery, and attempted murder. In his personal restraint petition (PRP), Williams alleges that due to the spread of COVID-19 in prisons, including his prison in particular, and his age, race, and disability, the conditions of his confinement have become a cruel punishment in violation of article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution. Williams asks to be released and argues a sentence of home confinement with his sister is the only effective remedy.

Although we hold that the Washington Constitution is more protective than the federal constitution in these circumstances, we conclude that Williams's incarceration does not violate the Washington Constitution considering (1) Washington's consistency with other states in its approach to releasing inmates during the COVID-19 pandemic; (2) an evaluation of Williams's risk in light of the Department of Corrections' continuously evolving multifaceted response to COVID-19; and (3) the penological purposes of ongoing confinement in Williams's case, which include ensuring community safety. Moreover, we follow recent Washington Supreme Court and Division One cases concluding that the Department has not been deliberately indifferent to the risk

of COVID-19 and, therefore, Williams's ongoing incarceration is not cruel and unusual under the Eighth Amendment.

We deny Williams's PRP and deny his motion for release. We also deny his alternative request for a reference hearing.

FACTS

I. WILLIAMS'S MEDICAL CONDITIONS AND CONVICTIONS

Williams is a 78-year-old, Black man who has been diagnosed with diabetes and hypertension. Since suffering a stroke in 2010, the right side of Williams's body has been largely immobilized. Williams now uses a wheelchair and receives assistance with activities of daily living.

In 2007, Williams "brutally assaulted" his ex-girlfriend, and she suffered "severe, life-threatening injuries." *State v. Williams*, noted at 160 Wn. App. 1036, 2011 WL 1004554, at *1-2. A jury convicted Williams of first degree burglary, first degree robbery, and attempted second degree murder. The jury returned special verdicts finding that Williams was armed with a deadly weapon for each offense. He was sentenced to approximately 270 months of confinement, and he entered prison in 2009 at the age of 67. His earned release date is in 2028. We affirmed his convictions on appeal. *Id.* at *5.[1]

---

[1] Williams also argued that the trial court had improperly entered an order stating that his lesser included first degree assault conviction was still valid in the event his attempted murder conviction was overturned on appeal. *Williams*, 2011 WL 1004554, at *5. We agreed with Williams that such an order violated double jeopardy and remanded for the trial court to address the error and vacate the assault conviction. *Id.*

This PRP was filed in the Supreme Court, along with a motion for release pending final determination and accelerated review pursuant to RAP 16.15(b) and 17.4(b). The PRP was promptly transferred to this court. We granted the motion for accelerated review.

II. WILLIAMS'S CONDITIONS OF CONFINEMENT AT COYOTE RIDGE AND HIS COVID-19 DIAGNOSIS

When Williams filed his PRP, he was incarcerated at Coyote Ridge Corrections Center. At that time, three staff members at Coyote Ridge had tested positive for COVID-19, but no one from the incarcerated population had yet tested positive. Although Williams's legal team had been advocating for his return to the Sage Unit, a unit for "elderly and/or infirm residents," Williams was living in the general population in a roughly 200 square foot cell with three other men. Department of Corrections' Resp. (Resp.), Ex. 3 ¶ 6 (Decl. of Dr. Frank Longano).[2] This was a dry cell without plumbing, so there was not an easily accessible sink for handwashing or a toilet. Williams was also regularly exposed to over 70 men in the cafeteria during meals. Williams repeatedly asked for a face mask in early April 2020, but face masks were not provided until April 17, 2020. As of May 12, 2020, Williams's face mask had never been washed, and he had not been provided any soap free of charge.

On April 14, 2020, Williams asked the Department for an "[e]xtraordinary [m]edical [p]lacement" of home confinement with his sister in another state. Pet'r's Reply to Resp. to PRP (Reply), Ex. 1, Attach. D ¶¶ 4, 8 (Decl. of Dayton L. Campbell-Harris). The secretary of the

---

[2] Williams was previously housed in the Sage Unit, but he returned to the general population in June 2019. Williams did not know why he was returned to the general population. Dr. Frank Longano, Deputy Chief Medical Officer for the Department, noted that Williams requested to return to the Sage Unit prior to his COVID-19 diagnosis and stated, "Mr. Williams' records indicate a history of being non-compliant and refusing to take his medications, though recent compliance appeared to be good." Resp., Ex. 3 ¶ 6 (Decl. of Longano).

Department *may* authorize an extraordinary medical placement outside of a Washington prison under RCW 9.94A.728(1)(c)(i)(A)-(C) when three conditions are met: (1) the person "has a medical condition that is serious and is expected to require costly care or treatment," (2) the person "poses a low risk to the community because he or she is currently physically incapacitated due to age or the medical condition or is expected to be so at the time of release," and (3) "granting the extraordinary medical placement will result in a cost savings to the state." For purposes of this statute, the term "incapacitated" is defined as "having a medical condition that renders the offender permanently unable or unlikely to engage in activities of daily living without assistance, to perform gainful employment, and participate in criminal behavior." Reply, Ex. 1, Attach. D, Attach. 2 (May 7, 2020 letter from Department's Health Services Division to Williams).

Williams was informed on May 7, 2020 that his request for extraordinary medical placement was denied because, although he met the medical criteria, he did not satisfy the "community safety criteria." *Id.* There was "no avenue for appeal illustrated on the . . . denial letter," and Williams does not attempt to appeal or seek review of the denial in this proceeding. Reply, Ex. 1, Attach. D ¶ 17 (Decl. of Campbell-Harris). Rather, he asks this court for the same remedy—release to home confinement with his sister—through the avenue of a PRP.

On May 14, 2020, Coyote Ridge reported its first confirmed case of COVID-19 in the inmate population. The Department transferred the infected inmate and others who were symptomatic to Airway Heights Corrections Center. Williams believes these symptomatic individuals were transferred from the unit where he was living at the time.

Coyote Ridge staff "delayed by two days" a quarantine of the units where the COVID-19 positive and symptomatic inmates had been living. Reply, Ex. 1, Attach. A at 1 (Office of the

Corrections Ombuds Monitoring Visit to Coyote Ridge). Once the quarantine began, when Williams needed to use the restroom, he would have to wait for corrections staff to come and unlock the cell and transport him to an Americans with Disabilities Act (ADA) compliant bathroom facility. Due to the infrequency of Williams's access to a toilet during this time, he often had to urinate in a bottle, and he repeatedly soiled himself. Others reported being forced to defecate in food storage containers during this quarantine period. In a report following a monitoring visit to Coyote Ridge, the Office of the Corrections Ombuds found the lack of toileting access concerning. The Department responded to the ombuds report by requiring corrections staff to check every 15 minutes whether individuals in dry cells needed to use the restroom.

On June 8, 2020, Williams was not feeling well.[3] He was transported to a local hospital on June 9, 2020, and upon admission he was septic with a high fever and a fast heart rate. He tested positive for COVID-19. Williams received oxygen, antibiotics, steroids, Plaquenil (hydroxychloroquine), and fluids for kidney failure.

On June 16, 2020, after 7 days in the hospital, Williams was transferred to the Airway Heights infirmary. The infirmary is designed for individuals who "need to be in an inpatient setting, but do not need continuous cardiac or pulmonary monitoring." Resp., Ex. 3 ¶ 9 (Decl. of Longano). In the infirmary, nursing staff provided care 24 hours a day, 7 days a week, and Williams received assistance with activities of daily living. At Airway Heights, Williams's

---

[3] Williams alleges his illness "was only discovered because his therapy aid noticed he wasn't feeling or looking well after Mr. Williams had taken yet another fall." Reply at 8; *see also id.*, Ex. 1, Attach. F ¶ 22 (Suppl. Decl. of Robert Williams ("My pusher realized that I had COVID-19 because I did not look or feel so good, and I had fallen.")).

symptoms improved, and his kidney function remained normal. However, Williams self-reported that he was "tired all the time." Reply, Ex. 1, Attach. F ¶ 8 (Suppl. Decl. of Williams).

By June 19, 2020, approximately one month after the first confirmed inmate case of COVID-19 at Coyote Ridge, 91 Coyote Ridge inmates, including Williams, had tested positive for COVID-19. One inmate had died from COVID-19 complications. When Williams filed his reply one week after that, on June 26, 2020, 45 staff at Coyote Ridge had tested positive, 112 inmates had tested positive, and 2 inmates who contracted the virus at Coyote Ridge had died. The ombuds initiated a review of the Coyote Ridge staff's response to the outbreak. The Department also initiated an "internal 'fact-finding' exercise" to investigate the delay in quarantining inmates who had been exposed to COVID-19. Reply, Ex. 1, Attach. A at 2 (Office of the Corrections Ombuds Monitoring Visit to Coyote Ridge).

In July 2020, Williams was transferred from Airway Heights to an intensive management unit at the Monroe Correctional Complex for a period of isolation. Williams remained in COVID-19 isolation there until July 30, 2020.

On August 7, 2020, Williams was transferred back to Coyote Ridge. That evening, staff noticed that Williams was having tremors. He complained of chest pain, shortness of breath, and excessive fatigue. After being treated with blood pressure medication in the infirmary, he was well enough to return to his cell that night.

On August 22, 2020, Williams was taken to the emergency room of Kadlec Regional Medical Center for shortness of breath and chest tightness. He tested negative for COVID-19 and was discharged that day. He remained in the Coyote Ridge infirmary for observation until August 24, 2020.

Since August 2020, Williams has resided at Coyote Ridge in a cell in the general population. Williams is in an ADA compliant cell that houses four men using two bunk beds. His cell is approximately 100 feet from an ADA compliant restroom, which Williams may access at any time, except during four 20-minute periods per day when inmates are being counted. Williams's recent medical care has included an appointment with a podiatrist and an evaluation for difficulties swallowing. Williams has not raised additional medical concerns, and the Department reports that "[h]e has access to medical care 24 hours a day, seven days a week," should he need it. Department of Corrections' Suppl. Br. (Resp't's Suppl. Br.), App. B ¶ 8 (Decl. of Sarah Landis, PA-C).

### III. The Department's Steps to Mitigate Risk Posed by COVID-19

*Coordinated Statewide Response:* The Department is now operating under the 22nd version (Nov. 3, 2020) of its *Washington DOC COVID-19 Screening, Testing, and Infection Control Guideline* (Guideline), and the Guideline is "continually updated" as knowledge about COVID-19 increases. Department of Corrections Mot. to Suppl. Record (Mot. to Suppl.), Ex. 1 ¶ 4 & Attach. A (Second Decl. of Scott Russell). The Department has employed an infectious disease doctor to oversee its infection prevention program and employed nurses specializing in infection prevention at each major prison facility. In February 2020, the Department opened an Emergency Operations Center to support a statewide COVID-19 response, and in March, the center was expanded. This summer, the Department developed an "Outbreak Checklist" that draws from its "considerable experience managing positive cases earlier this year." *Id.* As of October 2020, the Department had spent more than $29 million on its COVID-19 response. Additionally, the mortality rate within

Washington prisons has remained lower than the state's mortality rate overall, as well as the mortality rates of most other correctional agencies publicly reporting data.

*Staff Monitoring:* All staff are screened daily according to guidelines that are regularly updated. The Department has instituted an "enhanced screening process" for all staff and contractors using screening questions and temperature checks. Resp., Ex. 2 ¶ 18 (Decl. of Julie Martin). If staff fail this screening process, they are refused entry. The Department has created systems to track inmates who have had close contact with staff who have reported COVID-19 symptoms. If a staff member becomes ill, all incarcerated persons with whom they had contact are quarantined. Staff who have been ill are monitored to be sure they are no longer contagious before they can return to work. Staff who are able to telecommute have been encouraged to do so.

*Access:* The Department suspended all visitation at all of its facilities. The Department also suspended all volunteer programs and stopped allowing volunteers into the facilities. The Department is taking a "step-by-step approach" to resuming operations, and its "Safe Start plan" is publicly available at https://www.doc.wa.gov/corrections/covid-19/safe-start.htm. Resp't's Suppl. Br., App. A. ¶ 20 (Decl. of Russell).

*New Intakes and Transport Among Facilities:* The Department screens all inmates entering its custody using screening questions and temperature checks, and it requires new inmates to quarantine for 14 days upon entry at one of two reception centers.

A temperature and questionnaire screening process is also used for anyone in the Department's custody who is being transported between facilities. If an individual fails screening, they are given a surgical mask and placed in isolation. Staff responsible for transporting inmates "are required to wear gloves, eye protection, a gown or disposable coveralls, and an approved

respirator" when these precautions do not conflict with safety requirements. Resp., Ex. 2 ¶ 31 (Decl. of Martin). Staff must also disinfect transport vehicles before and after a transport, as well as at the end of each day.

The Department instituted new protocols to limit the volume of transfers occurring statewide, and it implemented additional transfer restrictions at Coyote Ridge following the outbreak there. The Department also reduced the number of individuals coming into its facilities by amending arrest protocols for those who violated conditions of community custody and imposing "non-confinement sanctions" for low-level violations, although this waiver has now expired. *Id.* ¶ 71.

*Cleaning and Disinfection:* The Department implemented an "intensive cleaning protocol focusing on sanitizing high touch surfaces." *Id.* ¶ 47. It trained some inmates to assist with ongoing cleaning efforts and provided inmates with access to cleaning products for cleaning their cells. All inmates have been given two bars of soap at no cost and access to water for handwashing. Free soap will be provided for the duration of the pandemic. Hand sanitizer is available in areas with staff supervision, although the ombuds reported some of the dispensers were empty during its May 15, 2020 monitoring visit.

*Social Distancing:* Social distancing protocols "discourage physical touching or handshakes," "limit dining room occupancy to only the number that allows for six-foot social distancing," reduce programming and density in the outside yards, require staggered pill lines and movements, close weight lifting facilities, and adjust religious services. *Id.* ¶ 53. These protocols permit "grab and go" meals and "in-cell feeding when warranted." *Id.* ¶ 55.

*Testing and Contact Tracing:* After the initial nationwide shortage of COVID-19 tests, the Department has now acquired sufficient tests and distributed them among their facilities. Test results are reported, and testing data is posted on the Department's website. At Coyote Ridge, where the Department experienced an outbreak in spring 2020, the Department tested all staff and all inmates in the Medium Security Complex and the Sage Unit in June 2020. The Department also implemented detailed guidelines for contact tracing. *See* Guideline *supra* p. 7.

*Quarantined and COVID-19 Positive Inmates:* The Department issued guidelines for screening, testing, isolating, quarantining, and providing clinical care. *See generally id.* The Department waived its copay for patient-initiated clinic visits and has encouraged all inmates to report to health services if they feel ill. Those who are "suspected or confirmed to have COVID-19" are immediately isolated, tested when they are symptomatic, and "assessed at least once every eight-hour shift" while in medical isolation. Resp., Ex. 2 ¶¶ 58-59 (Decl. of Martin). These inmates "remain in isolation until they are symptom-free for 14 days or have been symptom-free for 72 hours and have tested negative for COVID-19 twice, with at least 48 hours between tests." *Id.* ¶ 59. Inmates who are asymptomatic but have had "close contact" with an individual suspected or confirmed to have COVID-19 are quarantined. *Id.* ¶ 60. These inmates are housed either alone or with others who had the same exposure, and they are assessed twice daily by nurses.

If a quarantined inmate becomes symptomatic, they are immediately moved into medical isolation. The Department coordinated with other state agencies to set up regional care facilities to house those who test positive for COVID-19 and require a greater level of medical attention but do not need hospitalization. Inmates are hospitalized in the community when necessary.

*Masks and Personal Protective Equipment (PPE):* All facilities must ensure everyone wears appropriate face coverings. On April 14, 2020 the Department distributed PPE to staff, including some expired N95 masks. For the inmate population, the Department provided "bandana face covering packs that include all materials necessary to make two face coverings," so that one can be worn while the other is washed. *Id.* ¶ 64. After the outbreak at Coyote Ridge, all staff at that facility were "fit tested" for N95 masks and required to wear them. Resp't's Suppl. Br., App. A. ¶ 11 (Decl. of Russell).

*Reducing Prison Population:* On April 15, 2020 Governor Jay Inslee issued emergency Proclamation No. 20-50 Reducing Prison Population[4] and suspended in full or in part 16 statutes "to facilitate immediate prison population reductions." Resp., Ex. 2 ¶ 84 (Decl. of Martin). The proclamation "directed the Department to continue to explore actions to identify other incarcerated individuals for potential release through Rapid Reentry, furlough, commutation, or emergency medical release." *Id.* On April 15, 2020, Governor Inslee also issued an Emergency Commutation in Response to COVID-19[5] which commuted the remaining sentence of confinement for all individuals who were not incarcerated on "violent, serious violent, or sex offense convictions" and

---

[4] Proclamation of Governor Jay Inslee, No. 20-50 (Wash. Apr. 15, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-50%20-%20COVID-19%20Reducing%20Prison%20Population.pdf [https://perma.cc/C5J8-7KQ2].

[5] Wash. Gov. Jay Inslee, Emergency Commutation in Response to COVID-19 (Apr. 15, 2020), https://www.governor.wa.gov/sites/default/files/COVID-19%20-%20Commutation%20Order%204.15.20%20%28tmp%29.pdf?utm_medium=email&utm_source=govdelivery [https://perma.cc/Py9P-3YK9].

who had an earned release date on or before June 29, 2020. *Id.* ¶ 85. This resulted in the release of 422 inmates.

Through the Department's Rapid Reentry Program, which was created in response to COVID-19, an additional 528 individuals were released and are serving the remainder of their sentences in the community on electronic monitoring. The Department granted 66 individuals emergency furloughs, expedited release for some nonviolent offenders incarcerated for low-level community custody violations, and authorized the majority of pregnant inmates for rapid release.

*Additional Precautions at Units for Elderly and Infirm Inmates:* There are special housing units for elderly or infirm inmates, including the Sage Unit at Coyote Ridge and the K Unit at Airway Heights. Special restrictions apply to these housing units to protect their vulnerable populations. Restrictions limit the staff who may enter the units and require staff who enter to wash their hands and wear specific PPE. Procedures in these special housing units permit residents to dine separately from the rest of the incarcerated population and "allow individuals to self-quarantine in their cells, if they desire." *Id.* ¶ 57.

*Response to the June 2020 Coyote Ridge Outbreak:* Coyote Ridge staff imposed a quarantine of the units where the COVID-19 positive and symptomatic inmates had been living, but the quarantine was "delayed by two days," a response that the ombuds and the Department are reviewing. Reply, Ex. 1, Attach. A at 1 (Office of the Corrections Ombuds Monitoring Visit to Coyote Ridge). The Department then engaged in aggressive testing, contact tracing, and isolation practices. In June 2020, all staff at Coyote Ridge and all inmates housed in the Medium Security Complex and the Sage Unit were tested for COVID-19. Two hundred thirty-three inmates tested positive. The Department then reported that there were no "active" COVID-19 cases in the

incarcerated population at Coyote Ridge from mid-August through early November 2020. Resp't's Suppl. Br., App. A. ¶ 12 (Decl. of Russell).

*Substantial Compliance with United States Centers for Disease Control (CDC) Guidelines:* The Department asserts that it is in substantial compliance with CDC guidelines. In May 2020, Division One concluded the Department was in substantial compliance with the majority of CDC recommendations. *In re Pers. Restraint of Pauley*, 13 Wn. App. 2d 292, 299-300, 466 P.3d 245 (2020).

On October 15, 2020, the Department reported only 14 active cases among the incarcerated population statewide. Since that time, another outbreak has occurred at Coyote Ridge. The Department is engaging in serial testing, contact tracing, and quarantining of the affected units. Mot. to Suppl. Record, Ex. 1 ¶¶ 7-12 (Second Decl. of Russell). There have been no positive cases reported in the unit where Williams is currently housed. *Id.* ¶ 13.

## ANALYSIS

### I. PERSONAL RESTRAINT PETITIONS

A PRP offers relief from unlawful restraint. RAP 16.4(a). A restraint is unlawful if the "conditions or manner of the restraint . . . are in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(6).

To be entitled to relief under a PRP, "the petitioner must make a threshold showing of harm." *In re Pers. Restraint of McNeil*, 181 Wn.2d 582, 589, 334 P.3d 548 (2014). Where the petitioner raises a claim that was "afforded no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials," a showing of prejudice is not required. *In re Pers. Restraint of Gentry*, 170 Wn.2d 711, 714-15, 245 P.3d 766 (2010). The

petitioner "need only show [they are] unlawfully restrained." *Id.* at 715. A PRP based on conditions of confinement is not a "collateral attack on a judgment and sentence" subject to the time limit under RCW 10.73.090(1). There is no dispute that Williams is under restraint.

Because the available remedy is relief from unlawful restraint, when evaluating a PRP alleging unlawful conditions of confinement, we look to the petitioner's current conditions of confinement. *See, e.g.*, *Gentry*, 170 Wn.2d at 715 (requiring petitioner to show that "he *is* unlawfully restrained" (emphasis added)). Claims of unlawful restraint must be supported by facts, not conclusory allegations. *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 396, 978 P.2d 1083 (1999). The evidence presented must be "more than speculation, conjecture, or inadmissible hearsay." *Id.*

If there is an unlawful restraint, "the appellate court will grant appropriate relief," RAP 16.4(a), but only "if other remedies which may be available to petitioner are inadequate under the circumstances," RAP 16.4(d). *Compare State v. Scott*, 190 Wn.2d 586, 601, 416 P.3d 1182 (2018) (denying PRP requesting resentencing because the petitioner already had an "adequate remedy" of petitioning for parole), *with In re Pers. Restraint of Metcalf*, 92 Wn. App. 165, 173 n.5, 963 P.2d 911 (1998) (rejecting State's argument that a declaratory judgment action was an "adequate remedy" because counsel was not statutorily guaranteed in such an action). We note that Williams availed himself of the process for requesting an extraordinary medical placement, but this request was denied.

## II. ARTICLE I, SECTION 14 OF THE WASHINGTON CONSTITUTION

Williams challenges the conditions of his confinement under both the federal and state constitutions. "We have 'a duty, where feasible, to resolve constitutional questions first under the

provisions of our own state constitution before turning to federal law.'" *State v. Gregory*, 192 Wn.2d 1, 14, 427 P.3d 621 (2018) (internal quotation marks omitted) (quoting *Collier v. City of Tacoma*, 121 Wn.2d 737, 745, 854 P.2d 1046 (1993)). This ensures that the people are not deprived of their "'double security.'" *Id.* at 15 (internal quotation marks omitted) (quoting *Alderwood Assocs. v. Wash. Envtl. Council*, 96 Wn.2d 230, 238, 635 P.2d 108 (1981)).

Article I, section 14 of the Washington Constitution provides, "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." In contrast, the Eighth Amendment prohibits "cruel and unusual punishments." Washington courts have "repeated[ly] recogni[zed] that the Washington State Constitution's cruel punishment clause often provides greater protection than the Eighth Amendment." *State v. Roberts*, 142 Wn.2d 471, 506, 14 P.3d 713 (2000). But "'[e]ven where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications.'" *State v. Bassett*, 192 Wn.2d 67, 79, 428 P.3d 343 (2018) (alteration in original) (quoting *State v. Ramos*, 187 Wn.2d 420, 454, 387 P.3d 650 (2017)).

The Supreme Court has identified six neutral criteria as relevant to determining whether the Washington Constitution extends broader rights than the United States Constitution in a given situation. *See State v. Gunwall*, 106 Wn.2d 54, 61, 720 P.2d 808 (1986). The six factors are: the text of the state constitution, any significant differences between the state's text and the text of the federal constitution's parallel provision, state constitutional and common law history, preexisting state law, structural differences in state and federal constitutions, and whether the subject matter is of particular state interest or local concern. *Id.* at 61-62.

A.      *Gunwall* Analysis

The first *Gunwall* factor requires consideration of the text of the state constitution. *Id.* at 61. Article I, section 14 prohibits "cruel punishment." Cruel punishment has been held to include both disproportionate sentences and "certain modes of punishment." *State v. Manussier*, 129 Wn.2d 652, 676, 921 P.2d 473 (1996).

The second factor considers significant differences in the text of the parallel provision of the federal constitution. *Gunwall*, 106 Wn.2d at 61. The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The text of the Eighth Amendment is similar to the text of article I, section 14, but the federal provision refers to "cruel *and* unusual" punishment. *Id.* (emphasis added). "This difference indicates that '[a]rticle [I], section 14, on its face, may offer greater protection than the Eighth Amendment, because it prohibits conduct that is merely cruel; it does not require that the conduct be both cruel and unusual.'" *Bassett*, 192 Wn.2d at 80 (quoting *State v. Dodd*, 120 Wn.2d 1, 21, 838 P.2d 86 (1992)).

Third, courts look to state constitutional and common law history. *Gunwall*, 106 Wn.2d at 61. "Especially where the language of our constitution is different from the analogous federal provision, we are not bound to assume the framers intended an identical interpretation." *State v. Fain*, 94 Wn.2d 387, 393, 617 P.2d 720 (1980). The framers of article I, section 14 "were of the view that the word 'cruel' sufficiently expressed their intent, and refused to adopt an amendment inserting the word 'unusual.'" *Id.* (citing THE JOURNAL OF THE WASHINGTON STATE

CONSTITUTIONAL CONVENTION 1889 501-02 (B. Rosenow ed. 1962)).[6] Thus, the first three *Gunwall* factors, the text of article I, section 14, the absence of the words "and unusual," and our state constitutional history, all weigh in favor of our state constitution providing stronger protection.

Williams points to two recent Supreme Court cases, *Bassett*, 192 Wn.2d 67, which held life without the possibility of parole unconstitutional for juveniles, and *Gregory*, 192 Wn.2d 1, which held the death penalty unconstitutional as applied in Washington. Williams contends these cases show that previously acceptable punishment "can become cruel under article I, section 14 if there is a material change in circumstances." Pet'r's Opening Br. at 23. Courts have "relied on advances in social science data and psychology" to make these determinations. *Id.* The Department argues that these cases from the sentencing context are not relevant in the context of prison conditions.

Although Williams presents these cases as state constitutional history under the third *Gunwall* factor, these cases are most appropriately considered under the fourth *Gunwall* factor, which requires consideration of preexisting state law. 106 Wn.2d at 61-62. Turning to that factor, although *Bassett* and *Gregory* involved article I, section 14 challenges to sentences, rather than conditions of confinement, those cases establish that scientific developments and changes in circumstances can render a previously acceptable punishment cruel under our state constitution. *See Bassett*, 192 Wn.2d at 81 (looking at "how our jurisprudence on juvenile sentencing has

---

[6] *See* THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889 502 ("**Query:** Griffitts asked why the ordinary phrase 'cruel and unusual' was not used. **Answer:** Warner said that the committee thought the word 'cruel' sufficient. **Motion:** Griffitts moved to insert 'unusual' since he was opposed to execution by electricity. **Action:** Not reported, but presumably lost.").

evolved"); *Gregory*, 192 Wn.2d at 18-19 (relying on statistical analysis showing that the death penalty in Washington was "administered in an arbitrary and racially biased manner").

Further, the appellants in *Bassett* and *Gregory* argued that their sentences were disproportionate based on immutable characteristics of youth and race, respectively. *Bassett*, 192 Wn.2d at 72-73; *Gregory*, 192 Wn.2d at 23-24. Williams points out that immutable characteristics like age, race, and disability impact COVID-19 risks, and he argues that when the punishment of incarceration is imposed upon him during this pandemic, the risks related to COVID-19 render his punishment disproportionate to his crimes. Given the similarity between Williams's claim and recent cases where the Supreme Court expanded article I, section 14 to new contexts in light of a person's immutable characteristics, this preexisting case law weighs in favor of interpreting article I, section 14 to provide broader protections in this context.

Williams also refers to the Department's longstanding duty to keep an incarcerated person "in health and safety." *Kusah v. McCorkle*, 100 Wash. 318, 323, 170 P. 1023 (1918). Williams further cites to specific Department policies and the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, to demonstrate that Washington law has been responsive to concerns of discrimination on the basis of disability. Finally, Williams emphasizes that article I, section 14 is ultimately about "fundamental fairness," which in *Gregory* required the cessation of a sentencing practice that was producing arbitrary results and disparate impacts on a particular population. 192 Wn.2d at 28.

The Department notes that Williams has not cited state laws specifically applicable to prisons. According to the Department, the WLAD is inapposite because "the Department is not

discriminating in its response to COVID-19. It is the virus itself that has disproportionately affected certain populations." Resp. at 46.

We need not rely on the WLAD to find that factor four weighs in favor of interpreting article I, section 14 to provide broader protections. Punishment violates article I, section 14 when it is imposed in a manner that is arbitrary or biased, when it offends society's standards of decency, and when it lacks fundamental fairness. *Gregory*, 192 Wn.2d at 24. Preexisting state law weighs in favor of broader state constitutional protection where a punishment is alleged to have discriminatory or disproportionate impacts that may render it fundamentally unfair.

The fifth *Gunwall* factor, structural differences between the state and federal constitutions, "'will always point toward pursuing an independent state constitutional analysis because the federal constitution is a grant of power from the states, while the state constitution represents a limitation of the State's power.'" *Bassett*, 192 Wn.2d at 82 (quoting *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994)). "[T]he explicit affirmation of fundamental rights in our state constitution may be seen as a guarantee of those rights rather than as a restriction on them." *Gunwall*, 106 Wn.2d at 62. The Department recognizes that the fifth factor always supports an independent constitutional analysis.

The sixth and final factor asks whether the subject matter of the claim is of particular state interest or local concern. *Id.* Williams notes that "Washington leaders, rather than their federal counterparts, are taking the most direct action to combat the virus in Washington State." Pet'r's Opening Br. at 30. He cites to Governor Inslee's Proclamation No. 20-50, which ordered a reduction in the state prison population to address "'continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable

populations.'" *Id.* at 30 n.87 (quoting Governor Inslee Proclamation No. 20-50 (Wash. Apr. 15, 2020). The Department counters that preventing cruel punishments and the spread of COVID-19 are "nationwide" issues. Resp. at 47.

How state penal institutions are responding to COVID-19 is a local issue governed by state law. Article XIII, section 1 of the Washington Constitution provides that "penal institutions . . . and such other institutions as the public good may require, shall be fostered and supported by the state." Chapter 72.09 RCW is devoted to the Department of Corrections. *See* RCW 72.09.010(9) ("The system should meet those national standards *which the state determines to be appropriate*." (emphasis added)); RCW 72.09.030 ("There is created a department of state government to be known as the department of corrections."). Because the Department's COVID-19 response is a matter of state interest and local concern, this factor also favors greater state constitutional protection.

In sum, all six *Gunwall* factors weigh in favor of interpreting article I, section 14 to be more protective than the Eighth Amendment in this context, warranting independent state constitutional analysis.

B.      Developing an Appropriate Legal Test

Having determined that article I, section 14 provides broader protections in this context, we must now evaluate Williams's claim under the Washington Constitution. We note that no existing test under article I, section 14 is perfectly suited to addressing a challenge to the conditions of confinement, rather than a challenge to a particular sentence. The traditional test for assessing whether a sentence is disproportionate under article I, section 14 is the *Fain* factors. *See* 94 Wn.2d at 397 (considering "(1) the nature of the offense; (2) the legislative purpose behind the . . . criminal

statute; (3) the punishment defendant would have received in other jurisdictions for the same offense; and (4) the punishment meted out for other offenses in the same jurisdiction").

But the *Fain* framework "weighs the offense with the punishment," so where the petitioner raises "a categorical challenge based on the characteristics of the offender class," Washington courts have opted for a categorical framework instead. *Bassett*, 192 Wn.2d at 83. A categorical analysis consists of two steps. First, courts assess whether a "national consensus" exists regarding the practice at issue. *Id.* at 85. Second, courts conduct a "judicial exercise of independent judgment," which "requires consideration of 'the culpability of the offenders at issue in light of their crimes *and characteristics*, along with the severity of the punishment in question' and 'whether the challenged sentencing practice serves legitimate penological goals.'" *Id.* at 87 (emphasis added) (quoting *Graham v. Florida*, 560 U.S. 48, 67, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)).

Because Williams is challenging his punishment by arguing that his immutable characteristics make him disproportionately vulnerable to COVID-19, the categorical analysis appears more closely aligned with these circumstances than the *Fain* framework. But the existing categorical analysis is not a perfect fit. Applying a purely categorical analysis in the context of evaluating susceptibility to COVID-19 may not be as helpful as allowing an individualized assessment of the risk and potential harm to a particular inmate. Further, *Bassett* applied the categorical analysis to consider how the characteristic of youth affected culpability. *Id.* The characteristics identified here affect only an individual's medical vulnerability, not their culpability for the underlying offense.

The categorical analysis does not perfectly address Williams's challenge to his conditions of confinement, but we have flexibility under the law to adopt a more workable analysis by drawing from existing frameworks and newly relevant considerations. "We are free to evolve our state constitutional framework as novel issues arise to ensure the most appropriate factors are considered." *Id.* at 85.

To evaluate Williams's claim, we therefore engage in an adapted categorical analysis. We consider whether the conditions of his confinement create an unreasonable and unacceptable risk of death or serious injury in light of all relevant circumstances. First, we consider whether there is a clear national consensus against incarcerating people with similar characteristics and similar underlying convictions during the COVID-19 pandemic, as Washington courts have done when engaging in a traditional categorical analysis. *See id.* at 85-87. Second, we independently evaluate the severity of the risk for this petitioner, including how the conditions of confinement impact his degree of risk. This factor is informed by current scientific understandings of the virus, the individual characteristics of the incarcerated person, and the present conditions of confinement. And third, we consider whether legitimate penological purposes are served by this inmate's ongoing incarceration during the pandemic. *See id.* at 88-89. This factor requires a review of the incarcerated person's convictions, whether they have already served a large proportion of their sentence, and any Department assessment of the risk to public safety that release would pose.

C.    Williams's Article I, Section 14 Claim

Williams argues his sentence has become disproportionate and unconstitutional due to the spread of COVID-19 "in an institution unable to keep [him] safe." Pet'r's Opening Br. at 30. He contends that his case is analogous to *Gregory*, which held the death penalty unconstitutional as

administered in Washington, because "his immutable traits – age, disabilities and race – rather than his crime of conviction, increase the severity of his sentence." *Id.* at 33. Williams also points to *Bassett*, which held mandatory life without parole unconstitutional for juveniles, to argue that his sentence is disproportionate because "it fails to take into account his relevant biological traits." *Id.* He argues that his ongoing confinement during the pandemic serves no penological purpose and bears no relation to his crime.

We evaluate Williams's claim by considering the specific factors enumerated above and determining whether the conditions of his confinement create an unreasonable and unnecessary risk of death or serious injury from COVID-19. As explained below, while we acknowledge the increased risk Williams may face in his current environment due to his immutable traits, we disagree that his ongoing confinement serves no penological purpose, and we hold that his sentence remains constitutional.

### 1. National consensus on release eligibility during COVID-19

When Washington courts engage in a categorical analysis, they first consider whether a national consensus exists on the constitutionality of the punishment at issue before making an independent judicial determination. *See Bassett*, 192 Wn.2d at 85-87. As discussed below, since the COVID-19 pandemic has spread to the United States, several states have chosen to accelerate the release of certain categories of inmates. Most states have considered a combination of factors in deciding who is eligible for early release, including medical vulnerability, proximity to release date, the nature of the underlying offense, and public safety risks. States have not readily released inmates who have committed violent crimes.

For example, in Oregon, Governor Kate Brown chose to commute the sentences of 57 "particularly vulnerable" adults after directing the Oregon Department of Corrections to identify appropriate candidates on a case-by-case basis.[7] In announcing these commutations, Governor Brown declared that all of the recipients were "particularly vulnerable to COVID-19 and . . . do not present an unacceptable public safety risk."[8] Considerations included whether the underlying offense was "a violent crime against another person," whether the individual had served at least 50 percent of their sentence, and whether they could access suitable housing and health care upon release.[9]

Kentucky's Governor Andrew Beshear also commuted hundreds of sentences in three separate executive orders, and he similarly determined eligibility based on who was "particularly vulnerable" due to their age or medical conditions, had "fewer than five years" remaining to serve on their sentence, and not convicted of a violent or sexual offense.[10]

California expedited the transition to parole for inmates who had "60 days or less to serve on their sentences and [were] not currently serving time for a violent crime as defined by law, a

---

[7] Conrad Wilson, *Oregon Governor Commutes Sentences of 57 Inmates Vulnerable to COVID-19*, OR. PUB. BROADCASTING (June 25, 2020, 2:00 PM), https://www.opb.org/news/article/oregon-governor-commutes-57-prison-sentences-covid-19/.

[8] *Id.*

[9] *Id.*

[10] Executive Order 2020-699 (Ky. Aug. 25, 2020), https://governor.ky.gov/attachments/20200825_Executive-Order_2020-699_Commutations.pdf; Executive Order 2020-293 (Ky. Apr. 24, 2020), https://governor.ky.gov/attachments/20200424_Executive-Order_2020-293_Conditional-Commutation.pdf; Executive Order 2020-267 (Ky. Apr. 2, 2020), https://governor.ky.gov/attachments/20200402_Executive-Order_2020-267_Conditional-Commutation-of-Sentence.pdf.

sex offense, or domestic violence."[11] California continued to expedite release for inmates who were nearing their release dates, "not currently serving time for domestic violence or a violent crime as defined by law," not required to register as a sex offender, and not assessed as "high risk for violence."[12]

Pennsylvania established a "Reprieve of Sentence of Incarceration Program" to transfer to community corrections and home confinement individuals who were eligible for release within the next 12 months; at risk based on age, autoimmune disorder, pregnancy, or serious chronic medical conditions; and whose underlying convictions did not include a personal injury crime, crime of violence, firearms offense, deadly weapons enhancement, or certain sexual offenses or drug offenses involving firearms.[13]

New Jersey's Governor Philip Murphy directed the Department of Corrections to identify inmates for referral to either the State Parole Board or the Emergency Medical Review Committee, a committee created in response to the COVID-19 pandemic which considers eligibility for

---

[11] Press Release, Cal. Dep't of Corr. & Rehab. (CDCR), CDCR Announces Plan to Further Protect Staff and Inmates from the Spread of COVID-19 in State Prisons (Mar. 31, 2020), https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/.

[12] CDCR, *Expedited Releases* (last visited Nov. 23, 2020), https://www.cdcr.ca.gov/covid19/expedited-releases/.

[13] Commonwealth of Pa.: Office of the Governor, Order of the Governor of the Commonwealth of Pennsylvania Regarding Individuals Incarcerated in State Correctional Institutions (Apr. 10, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200410-GOV-DOC-reprieve-release-order-COVID-19.pdf.

placement in "temporary home confinement."[14] Referrals were identified based on age, underlying medical conditions, parole eligibility, and proximity to release date.[15] However, referrals were limited to inmates "who are not currently serving a sentence for an offense subject to the provisions of the No Early Release Act, [N.J. Stat. Ann. §] 2C:43-7.2."[16] The No Early Release Act applies to several violent crimes, including burglary and attempted murder. *See* N.J. STAT. ANN. § 2C:43-7.2(d). New York has similarly limited early release to nonviolent offenders "most of whom were a few months from their release."[17]

In Illinois, Governor Jay Robert Pritzker issued an executive order suspending provisions of the Illinois Unified Code of Corrections, 730 Ill. Comp. Stat. 5/3-11-1, that limited the permissible length of time for furloughs and the permissible justifications for furloughs, but otherwise left determinations of who should be eligible for furlough up to the Illinois Department of Corrections.[18]

Michigan Governor Gretchen Whitmer "strongly encouraged" county officials to consider early release for those held in jails who were older, had chronic conditions or were "otherwise

---

[14] Executive Order No. 124 ¶¶ 1, 5 (N.J. Apr. 10, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-124.pdf.

[15] *Id.* ¶ 1.

[16] *Id.* ¶ 2(b).

[17] Natasha Haverty, *Why New York is Releasing so Few Inmates During the Pandemic*, N. COUNTRY PUB. RADIO (July 24, 2020), https://www.northcountrypublicradio.org/news/story/41971/20200724/why-new-york-is-releasing-so-few-inmates-during-the-pandemic.

[18] Executive Order 2020-21 (Ill. Apr. 6, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-21.aspx.

medically frail," were pregnant, and were nearing their release dates, "so long as they do not pose a public safety risk."[19] Governor Whitmer further encouraged releasing persons incarcerated for traffic violations, failures to appear or pay, and those with behavioral health conditions who could be diverted to treatment.[20]

In addition to considering medical vulnerability, the national consensus endorses consideration of underlying offenses and public safety risks. Oregon, Kentucky, California, Pennsylvania, New Jersey, and New York have all explicitly limited eligibility based on the nature of an individual's underlying convictions and excluded those who committed specific violent offenses. Oregon, California, and Illinois have all relied on their Department of Corrections for assistance in determining which incarcerated individuals should be prioritized for release. None of these states seems to be releasing violent offenders.

Washington's approach aligns with this national trend. Governor Inslee commuted the "remaining confinement portion" of sentences for those who had an earned release date on or before June 29, 2020 and were not incarcerated on a "violent offense, serious violent offense, or sex offense." *See supra* note 5. Governor Inslee also encouraged the Department to consider accelerated release options for other inmates, and the Department has released hundreds of people under this guidance. *See supra* note 4.

Notably, the Department has evaluated Williams's request for release under the extraordinary medical placement program. In doing so, the Department concluded that Williams

---

[19] Executive Order 2020-29, ¶ 3(a) (Mich. Mar. 29, 2020) (effective through Apr. 26, 2020, 11:59 PM), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523422--,00.html.

[20] *Id.* ¶ 3(b)-(d).

was not eligible for release because he poses a risk to the community. Although the Department has not provided information regarding the reasons for its determination, given the violent nature of Williams's convictions, which include attempted murder with a deadly weapon enhancement, and the fact that his earned release date is not until 2028, this conclusion does not depart from the national consensus. Even considering Williams's risk factors, his continued incarceration does not depart from what other states have done in evaluating inmates for COVID-19-related release.

> 2.     <u>Severity of the risk faced by Williams</u>

Next, we consider the severity of the risk faced by Williams in particular, as well as how his characteristics and the conditions of his confinement impact that risk. As the Supreme Court did in *Bassett*, we look to the expertise of scientists to determine whether there is "'a clear connection'" between Williams's characteristics and an increased risk from COVID-19. 192 Wn.2d at 87 (quoting *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015)). Federal and state health officials have not determined whether infection with COVID-19 offers lasting immunity from reinfection, and we do not assume Williams's prior infection will protect him from future reinfection.[21]

As the Supreme Court recently explained, "[I]nmates live in close confinement with one another with no real choice as to social distancing or other measures to control spread of the virus." *Colvin v. Inslee*, 195 Wn.2d 879, 900, 467 P.3d 953 (2020). Public health experts recognize that prisons and jails have historically been sites where respiratory diseases are spread more easily, and

---

[21] The CDC has acknowledged that the immune response to COVID-19 is "not yet understood." CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Questions about COVID-19: Questions and Answers*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (last updated Nov. 18, 2020). At least one court has recognized that the risk of reinfection remains a "serious question." *United States v. Bandrow*, __ F. Supp. 3d __, 2020 WL 4050242, at * 6.

this remains true. Pet'r's Opening Br., App. 4 ¶¶ 9-10 (Decl. of Dr. Michael Puisis & Dr. Ronald Shansky); *see also Pauley*, 13 Wn. App. 2d at 312.

In addition, the CDC has found that 8 out of 10 COVID-19-related deaths in the United States have been adults aged 65 or older and that Black or African American people are 2.6 times more likely to contract COVID-19 than white people and 2.1 times more likely to die from it.[22] People who have diabetes and hypertension are "at increased risk of severe illness."[23]

Williams is a 78-year-old, Black man who has been diagnosed with diabetes and hypertension and who has experienced a stroke. When he had COVID-19, Williams was admitted to the hospital with sepsis, a high fever, and a fast heart rate. While there, he required oxygen and treatment for kidney failure. Williams remained hospitalized for seven days and then required constant nursing care in an infirmary for approximately two weeks. Williams clearly faces a risk of severe consequences from COVID-19.

The remaining question is the degree to which Williams's confinement exacerbates this risk. Williams is currently housed in an ADA compliant cell in the general population at Coyote Ridge with three other inmates. He has free access to an individual ADA compliant bathroom about 100 feet from his cell, except during inmate counts four times per day.

---

[22] CDC, *Coronavirus Disease 2019 (COVID-19): Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Sept. 11, 2020); CDC, *Coronavirus Disease 2019 (COVID-19): COVID-19 Hospitalization and Death by Race/Ethnicity*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Aug. 18, 2020).

[23] CDC, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html (last updated Nov. 2, 2020).

As described in detail above, the Department has engaged in a constantly adapting, statewide response to COVID-19. The Department has implemented precautions that restrict unnecessary access to its facilities; monitor staff and inmates for infection; ensure access to soap and hand sanitizer; ensure regular cleaning and disinfection of common area and cells; require the use of masks and, in certain situations, PPE; require social distancing whenever possible; provide for quarantines and treatment for ill inmates; and provide extra precautions for inmates who are at particular risk. And the record shows that the Department's response has expanded and evolved as the risk posed by COVID-19 has grown.

When there was a recent outbreak at Coyote Ridge, the Department engaged in aggressive widespread testing, contact tracing, and quarantining that controlled the outbreak, and there were several weeks in the fall of 2020 when there were no active cases at Coyote Ridge. In light of the rapid, significant increase in COVID-19 cases nationwide and in Washington in recent weeks, it is not surprising that additional cases have since been discovered at Coyote Ridge. But perfection is not a realistic expectation under these extraordinary circumstances. The Department has demonstrated an ability to respond aggressively to outbreaks, and the Department's response overall has been effective.

Further, when he was infected with COVID-19, the Department provided Williams with appropriate and successful medical care. Since his return to Coyote Ridge, Williams has continued to have access to "prompt and appropriate medical care." Resp't's Suppl. Br., App. B ¶ 8 (Decl. of Landis). The mortality rate among inmates statewide has been lower than among Washingtonians overall. Finally, Williams does not contend that he should be housed in a different unit—his only argument is that he should be released.

For as long as the pandemic continues, there will be some risk of harm for everyone, and that risk is undeniably elevated for inmates like Williams who have particular risk factors. The risk cannot be eliminated entirely. But the risk that Williams faces is mitigated by the Department's comprehensive and constantly evolving response to COVID-19, including the Department's provision of successful medical care to Williams when he was infected, and its demonstrated capacity to control an outbreak at Coyote Ridge through aggressive testing, contact tracing, and quarantining.

3.     Penological justifications for Williams's continued incarceration

The categorical analysis for evaluating whether a sentence is disproportionate requires consideration of whether the sentence "'serves legitimate penological goals.'" *Bassett*, 192 Wn.2d at 87 (quoting *Graham*, 560 U.S. at 67). We also consider this factor here. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Graham*, 560 U.S. at 71. The Sentencing Reform Act of 1981, chapter 9.94A RCW, aims to sentence people convicted of felony offenses in a manner that ensures the punishment is proportionate to the seriousness of the offense and the person's criminal history, promotes respect for the law, is commensurate with punishment imposed on others with similar convictions, protects the public, offers an opportunity for self-improvement, preserves state and local governments' resources, and reduces the risk of reoffending. RCW 9.94A.010.

To determine whether Williams's continued incarceration serves legitimate penological goals, we must consider the nature of his convictions, the amount of his sentence served and the amount remaining, as well as the risk to public safety if he were released. Williams was convicted of multiple violent felonies: first degree burglary, first degree robbery, and attempted second

degree murder, all with enhancements for being armed with a deadly weapon. Williams was charged with these offenses after he "brutally assaulted" his ex-girlfriend and she suffered "severe, life-threatening injuries." *Williams*, 2011 WL 1004554, at \*1-2. The violent nature of Williams's offense weighs in favor of a finding that his ongoing incarceration protects the public and reduces risk to others in the community.

Punishment is also a legitimate penological goal of imprisonment. *See Bassett*, 192 Wn.2d at 88. Williams is still serving his sentence for attempted second degree murder, and his earned release date is currently set for 2028. Unlike the inmates released early in Washington and in other states under the COVID-19 criteria discussed above, Williams still has several years to serve on his sentence for attempted second degree murder, even accounting for an anticipated early release. While not determinative, the length of time remaining on Williams's sentence also weighs against release.

Turning to the risk to public safety, the risk that Williams poses is arguably mitigated by his current medical conditions and disability. Since suffering a stroke in 2010, Williams has largely lost mobility in the right side of his body. He now uses a wheelchair and requires assistance with activities of daily living. He has difficulty seeing as well as writing. The Department concluded that Williams satisfied the medical criteria for an extraordinary medical placement.

But the Department nevertheless determined that Williams did not qualify for an extraordinary medical placement based on its "community safety criteria." Reply, Ex. 1, Attach. D, Attach. 2 (May 7, 2020 letter from Department's Health Services Division to Williams). Thus, the Department determined that Williams did not pose a low enough risk to the community to warrant release based on incapacitation. The decision of whether to grant an extraordinary medical

placement is entirely within the Department's discretion. *See* RCW 9.94A.728(1)(c)(i) ("The secretary *may* authorize an extraordinary medical placement [when the three requisite conditions are met]." (emphasis added)). Although Williams may suffer some degree of medical incapacitation, the Department is in a better position than this court to determine whether he poses a risk to community safety. We defer to their conclusion.

In sum, weighing the national consensus that inmates serving long sentences for violent crimes have not typically been released as a result of COVID-19; the current serious, but somewhat mitigated, risk to Williams in light of the Department's evolving precautions, recognizing the fact that the mortality rate is currently lower inside of Washington prisons than outside of them; and the remaining length of Williams's sentence, as well as the Department's conclusion that Williams still poses a risk to community safety, we hold that his continued incarceration does not violate article I, section 14. In light of this conclusion, we deny Williams's alternative request for a reference hearing.

## III. EIGHTH AMENDMENT

Williams also argues the Department violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to take reasonable measures to mitigate known risks presented by COVID-19. We disagree.

A.    Evaluating Eighth Amendment Claims During COVID-19

The Eighth Amendment prohibits "cruel and unusual punishments." It places restraints on the behavior of prison officials and also imposes affirmative duties, including the duty to provide "humane conditions of confinement" and the duty to provide adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). In evaluating Eighth

Amendment claims, Washington courts apply the standard from *Farmer*. *See Colvin*, 195 Wn.2d at 900 (applying *Farmer* to evaluate the Department's response to COVID-19); *Pauley*, 13 Wn. App. 2d at 310 (same). The petitioner must show "a substantial risk of serious harm and deliberate indifference to that risk." *Colvin*, 195 Wn.2d at 900 (citing *Farmer*, 511 U.S. at 832).

The first prong of the Eighth Amendment analysis requires "'an objectively intolerable risk of harm'" or "an unreasonable risk of serious damage to [the petitioner's] future health or safety." *Pauley*, 13 Wn. App. 2d at 310 (quoting *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020)). The second prong is satisfied where the petitioner shows that officials acted with "subjective recklessness or deliberate indifference; that is, the official must know of and disregard the risk." *Colvin*, 195 Wn.2d at 900 (citing *Farmer*, 511 U.S. at 837). "[P]rison officials are not liable for known risks if they have responded reasonably to the risk, 'even if the harm ultimately was not averted.'" *Pauley*, 13 Wn. App. 2d at 311 (quoting *Farmer*, 511 U.S. at 844).

In *Colvin*, the Supreme Court recently evaluated whether the Department's response to COVID-19 violated the Eighth Amendment rights of several inmates at various facilities around the state. 195 Wn.2d at 884. In *Pauley*, Division One analyzed the same question in the context of a personal restraint petition brought by a Monroe Correctional Complex inmate. 13 Wn. App. 2d at 294.

Addressing the necessary "substantial risk of serious harm," the *Colvin* court found persuasive petitioners' argument that "in prison and jail facilities, inmates live in close confinement with one another with no real choice as to social distancing or other measures to control spread of the virus." 195 Wn.2d at 900. The Supreme Court described the risk of a COVID-19 outbreak under these conditions as "undeniably high." *Id.* The *Pauley* court noted, "Public

health experts appear to agree that incarcerated individuals are at special risk of infection," and assumed this first prong was satisfied. 13 Wn. App. 2d at 312.

Turning to the second requirement, the *Colvin* court recognized Governor Inslee's "proactive orders" to reduce the incarcerated population and the Department's "multifaceted strategy" to protect those who remain incarcerated. 195 Wn.2d at 901. The court concluded that, "[w]hile reasonable minds may disagree as to the appropriate steps that should be taken," the record before the court did not show deliberate indifference. *Id.* Similarly, in *Pauley*, the petitioner failed to prove that officials had ignored risks to him. 13 Wn. App. 2d at 313. The record instead showed that the Department had "taken the threat of COVID-19 seriously" and had "taken reasonable and appropriate steps to mitigate the risk to incarcerated individuals." *Id.* at 316.

B.     Williams's Eighth Amendment Claim

With regard to the first prong of the Eighth Amendment test, whether Williams faces a substantial risk of serious harm, we do not depart from *Colvin* and *Pauley*. The Department does not urge us to find an absence of substantial risk because Williams has already had COVID-19 once.

The Supreme Court and Division One have already recognized that the risk of COVID-19 outbreaks in Washington prisons is "undeniably high." *Colvin*, 195 Wn.2d at 900. And "[p]ublic health experts appear to agree that incarcerated individuals are at special risk of infection." *Pauley*, 13 Wn. App. 2d at 312. In addition, Williams has submitted evidence that people over the age of 65 and those with significant cardiac conditions "have a higher probability of death if they are infected." Pet'r's Opening Br., App. 4 ¶ 12 (Decl. of Dr. Puisis & Dr. Shansky). The CDC has further recognized that "[l]ong-standing systemic health and social inequities have put many

people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19."[24] This record sufficiently demonstrates that Williams's age, significant cardiac conditions, and race create a substantial risk of him suffering an adverse outcome from COVID-19.

Even so, on this record Williams fails to demonstrate ongoing deliberate indifference by the Department. To succeed on an Eighth Amendment claim, Williams must show that officials have recklessly disregarded or ignored the risk to him. *See Colvin*, 195 Wn.2d at 900 (citing *Farmer*, 511 U.S. at 837); *Pauley*, 13 Wn. App. 2d at 313. Instead, this record shows numerous new restrictions, protocols, and policies that the Department has implemented since the emergence of COVID-19 in Washington, and even since the *Colvin* and *Pauley* courts found no deliberate indifference. The record shows that the Department's response has expanded and evolved as the risk posed by COVID-19 has grown, and the Department managed to control an outbreak at Coyote Ridge through aggressive testing, contract tracing, and quarantining. This is not deliberate indifference.

Further, when Williams exhibited symptoms of COVID-19, he was promptly transported to a hospital where he received medical care that enabled his survival and recovery. Then Williams was transported to an infirmary where he received constant nursing care. The Department's response to Williams's infection does not reflect deliberate indifference or reckless disregard to the risk of harm he faced.

---

[24] CDC, *Coronavirus Disease 2019 (COVID-19): Health Equity Considerations and Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last updated July 24, 2020).

Although Williams has described some troubling conditions of confinement that occurred in Coyote Ridge, in particular the initial two-day delay in implementing a quarantine and the initial lack of access to bathrooms during quarantines, the Department's responses indicate that these issues have now been remedied. Williams's current restraint is not the result of deliberate indifference, and Williams is not entitled to release under the Eighth Amendment.

CONCLUSION

We deny Williams's PRP and his motion for release. We also deny Williams's alternative request for a reference hearing.

Glasgow, J.

I concur:

Worswick, P.J.

Cruser, J. (Dissenting in part) — While I agree with the majority's analysis of Williams's petition under the Eighth Amendment to the United States Constitution and with the proposed test under article I, section 14 of the Washington Constitution, I write separately because I disagree that the third factor of this proposed test should be decided by deferring to the Department of Correction's (DOC) conclusion regarding the community safety component of the extraordinary medical placement analysis under RCW 9.94A.728(1)(c)(i)(B). On this narrow issue, I respectfully dissent.

Under the third factor of the majority's test for evaluating Williams's claim under article I, section 14, we consider the penological justification for his continued incarceration. This factor is derived from the second step in a "categorical bar" analysis that requires "judicial exercise of independent judgment," to evaluate "'whether the challenged sentencing practice serves legitimate penological goals.'" *State v. Bassett*, 192 Wn.2d 67, 87, 428 P.3d 343 (2018) (quoting *Graham v. Florida*, 560 U.S. 48, 67, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). Such penological goals include "retribution, deterrence, incapacitation, and rehabilitation." *Id.* at 88.

The majority explains that we must consider the nature of an individual's convictions and the risk the individual poses to public safety on evaluating this factor. I agree with this broader framework and with the majority's assessment of the nature of Williams's conviction as a violent one for which incarceration "protects the public and reduces risk to others in the community" as a general matter. Majority at 32.

Where I depart from the majority, however, is in its decision to defer to DOC's determination that Williams poses a risk to the community based on DOC's assessment of Williams's eligibility for extraordinary medical placement under RCW 9.94A.728(1)(c)(i). In

determining whether an individual qualifies for emergency medical placement, DOC evaluates three criteria:

> (A) The offender has a medical condition that is serious and is expected to require costly care or treatment;
>
> (B) The offender poses a low risk to the community because he or she is currently physically incapacitated due to age or the medical condition or is expected to be so at the time of release; and
>
> (C) It is expected that granting the extraordinary medical placement will result in a cost savings to the state.

RCW 9.94A.728(1)(c)(i). Each individual criterion must exist to allow extraordinary medical placement. RCW 9.94A.728(1)(c)(i). Persistent offenders and individuals sentenced to death or life without the possibility of parole are categorically excluded from release under this statute. RCW 9.94A.728(1)(c)(v), .728(1)(c)(ii).

The undisputed facts reflect that Williams uses a wheelchair and requires assistance with activities of daily living since suffering a stroke that caused him to lose mobility in the right side of his body. Williams is no longer able to read or write due to his deteriorated eyesight and lack of fine motor control. He is prone to falling and has suffered related injuries. DOC, in its letter denying Williams's request for extraordinary medical placement, stated that although Williams met the "medical criteria," the community screening committee reviewed his case and "and based on the above community safety criteria; it was determined that [he did] not qualify." Reply, Ex. 1, Attach. D, Attach. 2. DOC did not provide any further explanation as to why, despite his medical condition, Williams nevertheless posed a safety risk to the community and was not sufficiently incapacitated to qualify for extraordinary medical placement.

Notwithstanding DOC's lack of explanation regarding why Williams remains a threat to the community despite his medical conditions, the majority defers to DOC's determination, explaining that DOC is in a better position to evaluate whether Williams poses a risk to community safety. While I agree that DOC's analysis should be lent great weight, I disagree that this court should wholly defer to its decision, particularly where, as here, there is no dispute that Williams has serious and incapacitating medical conditions and DOC has not explained why he remains a threat to community safety, his medical condition notwithstanding. To defer in this circumstance abdicates this court's role in evaluating a personal restraint petitioner's claim.

I would instead refer the issue of whether Williams, in light of his current physical condition, poses a threat to community safety for a reference hearing before the superior court. *See In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992) (holding that "the purpose of a reference hearing is to resolve genuine factual disputes."). Resolution of this factual issue could then provide the foundation for evaluating whether continued incarceration serves a penological purpose. Accordingly, I respectfully dissent.

CRUSER, J.